NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2016 VT 130

No. 2016-182

In re D.S. and W.S., Juveniles

Supreme Court

On Appeal from
Superior Court, Caledonia Unit,
Family Division

September Term, 2016


Robert R. Bent, J.

Michael Rose, St. Albans, for Appellant Mother.

Matthew Valerio, Defender General, and Sarah Star, Appellate Defender, Montpelier, for
 Appellant Father.

William H. Sorrell, Attorney General, Montpelier, and Jody A. Racht, Assistant Attorney
 General, Waterbury, for Appellee State.

Allison N. Fulcher of Martin & Associates, PC, Barre, for Appellee Juvenile.


PRESENT:  Reiber, C.J., Dooley, Skoglund and Robinson, JJ., and Teachout, Supr. J.,
          Specially Assigned


¶ 1.    **DOOLEY, J.**  Mother and father separately appeal from a family court judgment terminating their parental rights to the minors D.S. and W.S.  Mother contends the court improperly relied on factors beyond her control in concluding that her ability to parent had stagnated.  Father asserts: (1) the court improperly failed to address individually whether his ability to parent the children had stagnated; (2) the evidence failed to show that he was unable to resume parenting within a reasonable time; and (3) the court violated his right to due process of law by relying on expectations not in the case plan.  We reverse as to both parents and remand.

¶ 2. The facts may be summarized as follows. Although family services had earlier been provided to the family, these proceedings arose out of a report in early July 2014 that D.S., then a little under two-and-a-half years old, had been found unsupervised at the Danville Post Office, located near the family's residence. A social worker with the Department for Children and Families (DCF) visited the home the next day and observed D.S.'s younger brother W.S., then about five months old, rolled in a blanket with a bottle propped up nearby, which raised concerns about the safety of the child's sleep environment. Shortly thereafter, the parents violated a DCF safety plan that had called for the children to stay with their paternal grandparents, resulting in an emergency care order placing them with the grandparents, with whom they have since remained.

¶ 3. In September 2014, the parents agreed to an adjudication that the children were in need of care or supervision (CHINS) based on stipulated facts, including those noted above concerning D.S. and W.S., as well as the fact that father had a conviction for aggravated domestic assault from a prior relationship, was diagnosed with bipolar disorder, and was not taking his medication.

¶ 4. In October 2014, the court adopted a disposition plan with concurrent goals of reunification by March 2015 or adoption. The plan recommended extensive parenting education services for both mother and father, including Family Time coaching through Easter Seals, as well as individual counseling. Despite the plan's projected end-date of March 2015, in December 2014 DCF amended its case-plan goal to adoption based, as the court found in this termination-of-parental-rights proceeding, on its conclusion that mother had not "progress[ed] beyond the very basics" in keeping the children safe, and father had not participated regularly in Family Time coaching. DCF did not request that the court amend the disposition order. The court found further with respect to father that his work schedule from October through December 2014 had prevented his regular participation in Family Time coaching; that a request to schedule father separately from mother was denied by DCF in part because DCF had identified mother as the primary caretaker;

2

and that by January 2015, father had begun to participate more regularly in Family Time sessions, and the Family Time coach "did not have concerns with respect to [f]ather's capacity to attend to the safety of the children."

¶ 5. In January 2015, the State filed petitions to terminate parental rights. An evidentiary hearing was held over the course of three days in October and December 2015, and January 2016, and the court issued a written decision in May 2016. The court found, with respect to mother, that although she had been diligent in attending the recommended programs, she had made little progress toward the case plan's basic "expectations for ensuring a safe environment for the children" and "remain[ing] focused on [their] needs." Accordingly, the court concluded that mother's ability to parent the children had stagnated, and applying the statutory best-interests criteria, further concluded that she was not playing a constructive role in the children's lives, and could not resume parental responsibilities within a reasonable time. As discussed more fully below, the court found that although father had largely addressed any concerns that had led to DCF intervention, he did "not appear to want to parent on his own," and as such, could not resume parental responsibilities. Accordingly, the court granted the petitions. These separate appeals followed.

¶ 6. The family court generally undertakes a two-step analysis in termination-of-parental-rights cases, first determining whether there has been a substantial change in material circumstances from the initial disposition order, and, if there has, whether the best interests of the child require termination of parental rights. In re S.W., 2003 VT 90, ¶ 4, 176 Vt. 517, 833 A.2d 879 (mem.). A substantial change of circumstances "is most often found when a parent's ability to care for a child has either stagnated or deteriorated over the passage of time." Id. (quotation omitted). Stagnation may be found when the parent "has not made the progress expected in the plan of services . . . despite the passage of time." In re D.M., 2004 VT 41, ¶ 5, 176 Vt. 639, 852 A.2d 588 (mem.). We will affirm the trial court's findings in support of changed circumstances

3

unless they are clearly erroneous, and its conclusions if reasonably supported by the findings.  In re S.W., 2003 VT 90, ¶ 4.

¶ 7.    We have also recognized that "stagnation caused by factors beyond the parents' control could not support termination of parental rights."  In re S.R., 157 Vt. 417, 421-22, 599 A.2d 364, 367 (1991).  Mother claims that this was the case here for several reasons.  First, she cites several deficiencies in the case plan itself, which were identified by the trial court.  In particular, the court noted that the plan did not contain a separate "statement of family changes needed to correct the problems necessitating State intervention," as required by 33 V.S.A. § 5316(b)(5).  The court further concluded, however, that the necessary changes were apparent from the factors leading to DCF custody, the parents' identified areas of risk, and the objectives detailed in the case plan.  These objectives were plainly stated, and included requirements that mother "acknowledge that the lack of supervision and unsafe sleep put the boys at risk," demonstrate "a willingness to learn how to safely parent," "show that she is able to respond to coaching [] during Family Time and apply what she is learning in the Nurturing Parent Program to time spent with the boys," and engage in "Child-Parent Psychotherapy to learn how to safely parent the boys and form a healthy attachment."  In addition, the plan called for mother to engage in individual counseling to address her own childhood "trauma so that she is able to safely parent" D.W. and W.S.  As the trial court concluded, these statements adequately conveyed the changes necessary for mother to correct the problems that led to DCF intervention.

¶ 8.    Mother also cites the trial court's observations that the case plan's requirement that she engage in individual counseling in order to "work through" her childhood trauma did not appear to have been based on any "evaluative process made known to the court," and that "[a] comprehensive clinical assessment may have provided greater clarity as to [mother's] mental health or cognitive issues and whether they could be meaningfully addressed."  The court's observations in this regard were just that—observations.  The court did not rely to any extent on

4

mother's failure to engage in individual counseling in its finding of stagnation. Whatever deficiencies existed in this regard, therefore, were harmless. See In re B.S., 163 Vt. 445, 454, 659 A.2d 1137, 1143 (1995) (noting that reversal is required only where error results in prejudice).

¶ 9. Additionally, mother maintains that the court's findings contain no "indication that [her] alleged stagnation was the result of non-engagement in recommended services." This is technically correct but of limited significance. As noted, the court's finding of stagnation was not based on mother's failure to engage in services but on her failure to make meaningful progress over time in the parenting programs she attended. Although mother had generally engaged in the recommended programs, the court found that she "was unable to learn and apply best practices concerning the infant's sleep environment" and was unable to "consistently follow directions and simple instructions or [] to fulfill simple expectations for ensuring a safe environment for the children."

¶ 10. Finally, mother notes the court's finding that Family Time coaching ended just as she "was beginning to show some progress." Although her argument is not well developed, it refers to DCF's decision to shift to an adoption-only goal in December 2014, before the March 2015 end-date contemplated in the case plan. The court found, in this regard, that mother's progress to the point when services were terminated was inadequate, and predicated its finding of stagnation on that basis. Mother's argument is essentially that DCF's decision was premature. For the reasons set forth below, we agree.

¶ 11. Although DCF determined to modify the case plan in December 2014, the trial court found—and the record shows—that Family Time coaching actually continued through January and February 2015; that father's work schedule had changed sufficiently for him to become engaged in sessions at this time; and that mother "made some gains in Family Time Coaching during January and February 2015" in addressing child-safety issues. Despite these gains, the court further found that "the Coaching never advanced to more substantive parent-child

5

issues . . . . [because] DCF had decided to close down Family Time Coaching on the recommendation of the Family Time coach—and shift to an adoption-only case plan," making it "impossible for the court to determine whether Mother's gains would have been more meaningful if Family Time Coaching had continued."[1]

¶ 12. The difficulty of determining mother's future progress notwithstanding, the Family Time coach testified that mother showed improvement when father re-engaged in early 2015 and both parents were present to "support[] one another." The coach testified that her need to intervene to assist mother became less frequent with father's participation, and she noted significant progress during this period in mother's ability to engage with the children and show affection. Indeed, the Family Time coach acknowledged that "safety was not much of an issue when [father] was present in the last two months [i.e., January and February 2015] of Family Time coaching."

¶ 13. The court further found that, "when Family Time coaching ended in February 2015, and the adoption-only case plan began," DCF required that supervised visits occur in the Family Room, a secure visitation center. The court found that visits in this setting initially went well; that the children were excited to see their parents; and that "the parents seemed to engage in play with the boys and set limits that the boys responded to" and "appropriately encourage[d] development." The supervisor "did not report any safety issues or . . . failure to intervene when something was unsafe." Unfortunately, the parents' supervisor left the program and the court found that "[t]hrough the fault of the Family Room, visits with the children thereafter became inconsistent" and under the new supervisor were not "designed to assist or increase parental autonomy with respect to the children."

---

[1] The Family Time coach testified that Easter Seals closed the Family Time referral only when DCF changed the case plan goal to adoption only. The DCF social worker testified that DCF decided to change the goal to adoption in December 2014, prior to the contemplated end-date of March 2015, principally because of mother's failure to make sufficient progress in Family Time coaching, and also because mother had not signed up for the Safe Babies Program.

6

¶ 14.   In light of these findings, the conclusion is inescapable that DCF's decision to shift from a concurrent goal of reunification/adoption to adoption-only—several months before the timeframe contemplated in the approved case plan—was premature. Although, as the trial court observed, it is impossible to know whether mother would have progressed sufficiently to resume parental responsibilities, the evidence and findings indicate that—in the co-parenting scenario envisioned in the case-plan—mother had made progress and did well under supervision until staffing changes inhibited further progress. Accordingly, we conclude that the predicate finding that mother's failure to progress amounted to stagnation was unsupported, and therefore that the judgment terminating mother's parental rights must be reversed.

¶ 15.   Turning to father's claims, he asserts that the trial court improperly failed to make an individual determination as to whether his ability to care for the children had stagnated; that the evidence failed to support a finding that termination of his parental rights was in the children's best interests; and that the court violated his due process rights by terminating his parental rights without adequate notice of changes necessary for him to reunite with the children.

¶ 16.   As to father's first claim, the issue is moot because, as discussed earlier, the finding of stagnation as to mother was premature.

¶ 17.   We agree, however, that the findings are insufficient to support a conclusion that a termination of father's parental rights was in the best interests of the children. In assessing a petition to terminate parental rights, the family court "must consider each parent individually." In re H.A., 153 Vt. 504, 513, 572 A.2d 884, 889 (1990). Here, the court's findings on whether a termination of father's parental rights was in the children's best interests were minimal, at best. The court noted that father's participation in the children's lives had been limited, but found that this was largely due to unwarranted restrictions by DCF. It further found that, if mother's rights were terminated and father's remained intact, father would ultimately "place responsibility for the children with" mother. This finding was apparently predicated on mother's history as the primary

7

parent, the court's additional finding that father had not "developed an independent presence" with the children, and ultimately its finding that father "does not appear to want to parent on his own." Thus, the court concluded that "neither parent appears to have the ability to fulfill their parental duties within a reasonable period of time."

¶ 18.    These findings, which comprise the bulk of the court's consideration of the best-interests criteria as to father, are not supported by clear and convincing evidence, and do not in turn support a conclusion that a termination of father's parental rights was in the children's best interests.  Although the State asserts otherwise, the only evidence it cites to support the finding of father's unequivocal unwillingness to parent on his own is that the parents were married and "presented as an intact parenting couple" in the case plan, that their Family Time coach approached them as a co-parenting couple, and that they stated in their proposed findings that they planned to continue to reside together and "co-parent the children if the Court denies the petition to terminate their parental rights."[2]

¶ 19.    These facts do not, however, clearly and convincingly demonstrate that father was unwilling or unable to parent the children alone, or support a conclusion that, even with mother's rights terminated, the children's best interests required a termination of father's, as well.  As the State notes, the parents and DCF had proceeded on the assumption of a reunified co-parenting family; there was no plan of services predicated on father's assuming sole parental responsibility, and no evidence offered on that point.  To the extent that the evidence showed anything about father's commitment, it showed—as the court elsewhere found—that he had successfully addressed the case plan goals concerning his mental health, his potential for domestic violence, and certain "unspecified deficits in parenting skills."  As to the issue of domestic violence, the

---

[2]  Although not cited by the trial court or the State, we also note that the case plan's author stated that a domestic violence specialist told her that father had told the specialist that he considered it mother's responsibility to care for the children.  This double hearsay does not demonstrate clearly that father was unwilling to assume parental responsibilities in the event that mother's parental rights were terminated.

court found "no evidence that [f]ather used physical violence against either his wife or either of the subject children," and concluded that the State had not "proven by the requisite standard that domestic violence on the part of [f]ather has been present in the household" or that father could be faulted for failing to address it. As to father's bipolar diagnosis, the court found no evidence to show how, if at all, it "may have impacted the children," and further found that father had "taken steps to improve his mental health and has demonstrated treatment compliance." Finally, as to father's parenting skills, the court found that "[t]o the extent the case plan anticipated improved parenting skills on [f]ather's part, it does not identify those parenting skills [f]ather lacked which were to be addressed by the Family Time coaching model." The court also found in this regard that father's less than "robust" contact with the children was initially attributable to DCF's restrictions based on unsubstantiated concerns about father's domestic violence and mental health, and that later supervision of his visits was not done in the "least restrictive setting for parent-child contact [and] ha[d] allowed for little growth in the relationship between [f]ather and his children."

¶ 20. Without a showing of father's failure to successfully complete a plan of services designed to maximize <u>his</u> opportunity to safely parent the children and resume parental responsibilities within a reasonable time, we cannot conclude that the evidence was sufficient to demonstrate that a termination of his parental rights was in the best interests of the children. Accordingly, we conclude that the judgment as to father must also be reversed. Our holding renders it unnecessary to address father's remaining claims.

The judgment of termination of mother's and father's parental rights is reversed, and the case is remanded for further proceedings consistent with this decision.

FOR THE COURT:

_____
Associate Justice

9