SKOGLUND, J., dissenting.
 

 ¶ 51. "[T]he freedom of children and parents to relate to one another in the context
 of the family, free of governmental interference, is a basic liberty long established in our constitutional law."
 
 In re N.H.
 
 ,
 
 135 Vt. 230
 
 , 236,
 
 373 A.2d 851
 
 , 856 (1977). In order to ensure that this fundamental liberty will not be unduly denied, the Legislature has expressly provided that a child be separated from its parents "only when necessary to protect the child from serious harm or in the interests of public safety." 33 V.S.A. § 5101(a)(3). In
 
 In re N.H.
 
 , we wrote "[t]he statute certainly does not allow for intervention simply because a child might be better off somewhere else."
 
 135 Vt. at 236
 
 ,
 
 373 A.2d at 856
 
 .
 

 ¶ 52. The deference to be accorded the parent-child relationship was eloquently described by the late Justice Larrow in his concurring opinion in
 
 In re J.
 
 ,
 
 134 Vt. 480
 
 , 486,
 
 365 A.2d 521
 
 , 525 (1976) :
 

 I do not view the statute as trying to create the best possible world. I do not think it intends to set up a mechanism for transferring parental rights from those in temporary difficulty to those more affluent and adjudged by the social worker as more capable of educating and rearing the progeny ....
 

 ¶ 53. In the case of
 
 In re N.H.
 
 , the Court noted "the existence of some questions concerning the ability of the appellant [father] to assume an active, responsible parental role."
 
 135 Vt. at 237
 
 ,
 
 373 A.2d at 856
 
 . But the Court found it "beyond dispute that he, with the support of his parents, [stood] willing and able to provide N.H. with a family environment," and reversed the lower court's disposition order that had placed the child in the custody of the Department of Social and Rehabilitation Services, as it was called at the time.
 

 Id
 

 . at 237
 
 ,
 
 373 A.2d at 856-57
 
 . I suggest the same situation is present in this case.
 

 ¶ 54. In this case, mother and father had been in a "toxic" marriage for ten years and had four children. There was apparently parental fighting, neglect, and dysfunction. While mother testified that father was emotionally abusive, sexually coercive, and had threatened her physically on one occasion, she denied that father was ever physically assaultive. The conditions in the home were described as "filthy" and the children went to school dirty and odorous. Eventually, a child-in-need-of-care-or-supervision (CHINS) petition was filed, and the children were removed from the home in June 2016. After the children were removed from the home, mother and father ended their marriage.
 

 ¶ 55. At the first hearing following the removal, both parents took responsibility for the CHINS allegations and admitted that, at that time, neither parent was meeting the children's basic needs for hygiene, dental appointments, medical care, and therapy. They conceded that mother's unmet mental-health issues left her unable to protect the children from risk of harm and neglect and that father's preoccupation with mother prevented him from meeting the children's needs.
 

 ¶ 56. A September 2016 disposition plan called on father to fulfill many requirements, including: participation in and completion of a domestic-violence program; demonstration of an understanding of the impact his use of violence had on his family; commitment to living violence-free; signing of all releases for DCF regarding ongoing treatment recommendations; adherence to visitation guidelines as set up by the Department for Children and Families (DCF) and WomenSafe; attendance and participation in all court hearings; and maintenance of safe and adequate housing. For reasons not readily apparent, DCF's disposition case plan contemplated reunification with mother only or adoption. Father disagreed with the plan but agreed to participate in the Domestic Violence to Responsible Choices (DVRC) program.
 

 However, he was deemed ineligible because he denied physical-abuse allegations in the referral that DCF required him to sign. Father requested an evidentiary hearing on the issue of whether he had been physically abusive to mother, which the court consolidated with the hearing on the disposition plan. At the time of the consolidated hearing, mother was living in New Hampshire with her boyfriend.
 

 ¶ 57. At the consolidated hearing, the sole allegation of physical abuse was H.F.'s disclosure to a social worker that she allegedly watched father take mother into a room and then heard mother yell, "[s]top, no you are hurting me!" At the hearing, the court addressed father's counsel suggesting that the testimony seemed to be focused on physical violence. The court stated:
 

 [T]he Court has heard substantially more evidence of a pattern of controlling behavior, which is textbook domestic violence-battering behavior.
 

 You know as well as the Court ... that domestic violence is not limited to physical violence and in fact, sometimes is even more violent and more destructive of relationships and particularly more concerning for children when it's psychological violence. And that's the evidence that the court has heard thus far here.
 

 ¶ 58. After the first day of the consolidated hearing, the court informed the parties that the court would not require proof of physical violence to support a finding of domestic violence. During the second day, the court again reiterated the distinction it applied to domestic violence: "the question for the [c]ourt is whether ... it's a problem that's symptomatic of a larger problem, which is a pattern of domestic abuse, which extends beyond or does not necessarily include physical violence, but may include emotional violence and controlling behaviors."
 

 ¶ 59. In its written decision, the court found by a preponderance of the credible evidence that father did engage in a pattern of domestic abuse. It noted that father denied physical violence and wrote "while there may not have been a well-established pattern of physical violence, there was a clear pattern of emotional abuse and controlling behavior, directed primarily at [m]other, but also at the children." The court then held that there were no facts that warranted the exclusion of reunification with [f]ather as a goal of the plan, stating, "[i]ndeed, if there were no hope or expectation of reunification with father, there would be no need for his completion of a batterer's intervention program." It adopted the plan with one exception: that the case plan goal be modified to recommend reunification with mother or father or adoption.
 

 ¶ 60. By the time father started DVRC, he had been in counseling for six months, was gainfully employed, had a stable home, and was consistently visiting with the children. He met the program's expectations and graduated from the twenty-six-week program on schedule. In fact, father's progress so impressed his instructor that she asked him to be interviewed about his experience for a television segment about the program. DCF, however, was not impressed and remained fixated on the idea that father needed to admit to some unspecified instance of physical violence. Apparently, DCF did not understand the court's determination that the domestic abuse in this case was primarily emotional abuse and controlling behavior.
 

 ¶ 61. As described in the majority decision, the children were placed in two separate foster homes: the girls with a family in Bristol and the boys with another in Middlebury. The children all remained at
 the same elementary school and saw each other every day. At the post-disposition review hearing in February 2017, father asked DCF and the court to increase his visits. He proposed several family members who could support visits, including an aunt who was a licensed foster parent and early childhood educator. The court urged DCF to increase visits, but DCF did not. Father filed a formal motion to increase visits in April 2017.
 

 ¶ 62. After the motion was filed, DCF changed the visits from one hour a week with the girls and one hour with the boys, to a combined visit of one time per week for two-and-a-half hours with all four children. When father's motion came before the court for hearing on May 30, 2017, the permanency hearing occurred at the same time. That plan called for reunification to happen in the next three months or a termination-of-parental-rights (TPR) petition would be filed. Father agreed with the permanency plan that included reunification with him within three months but emphasized that increased visits were essential for him to realistically meet the three-month permanency goal and argued that he had insufficient contact with the children to effectuate the plan. At that hearing, the attorney for the children strongly advocated for father to have more contact with the children, reporting "on behalf of the kids who I've met with each of them individually, they would like to have more time with their dad." The social worker objected, claiming the clinical team did not support extended family supervising visits at all. The court did not increase visits at that time. Nor were visits gradually increased over the next three months. DCF indicated at a status conference it was not ready to support additional visits between father and the children supervised by father's aunt because of a failed letter-writing scheme that was to occur between the aunt and the children. It is worth noting, as did the court, that father's aunt had served as a licensed foster parent, had been an early-childhood educator for twenty-eight years, has a certification in Child Development, had operated her own day care, and had taken care of children with special needs.
 

 ¶ 63. After some occurrence that resulted in the boys' foster mother seeking party status and a relief-from-abuse order against father which was withdrawn,
 
 [7]
 
 father filed a revised motion to transfer custody of all four children to his aunt and asked for a speedy hearing. The following day, the State filed its petition to terminate father's parental rights. Thus, less than two months after the permanency planning hearing where the State had assured the court it was not looking for an immediate TPR if reunification did not occur over the next three months,
 
 [8]
 
 it changed its mind.
 

 ¶ 64. While the TPR was pending, father completed all aspects of the case plan-finishing DVRC, completing a parent-education program, and continuing to engage in counseling. At the TPR hearing with a new judge presiding, the State argued that despite father's compliance with all aspects of the case plan, he had stagnated. In the alternative the State argued that father had stagnated because he had not taken responsibility for physical abuse against mother.
 

 ¶ 65. When mother took the stand to voluntarily relinquish her parental rights to the children, she testified that father had not been physically abusive towards her. Question: "[D]id [father] ever physically hit or abuse you?" Answer: "No." She described the abuse in her marriage as "controlling and manipulative." She specifically testified "[father's] never hit me. He's never been physical with me."
 

 ¶ 66. The court terminated father's parental rights, basing its decision on DCF's theory of stagnation because he had not taken full responsibility for his role in the neglect and abuse to which the children were exposed and that he failed to admit to physical violence. The court relied on factual allegations that were contained in DCF's characterization of the facts, not witness testimony. It erroneously found that all four children reported physical abuse by father when that was not true. It erroneously found that after father believed mother was having an extramarital affair, he "ripped [mother's] dress off, then burned it while the children watched." There was no testimony that he "ripped" the dress off mother, only that he subsequently burned it. The court also found that the prior judge, Judge Hoar, had specifically found that father physically abused mother. As discussed above, he did not. The court also said that the guardians ad litem (GALs) supported termination of parental rights. However, the GALs actually suggested a four-to-six-month window for father to have more visitation with the children to better enable reunification.
 

 ¶ 67. While acknowledging that "father has worked harder than many parents to comply with the case plan and has made laudable progress ... even he agrees that he is not ready to take the kids home now." At the time of the hearing, father testified that he believed the children should not be returned to his home immediately because he had not been a part of their lives in two years despite his efforts, and he had not been given an opportunity to repair the damage in their relationship. The court acknowledged that father now lives in an appropriate home with a woman who has a college degree and a license as an elementary school teacher and who had previously worked at a childcare center. The court noted that she has not met the children because DCF would not allow it. DCF had also not allowed the children to see father's current home.
 

 ¶ 68. In TPR cases, the family court "first determine[es] whether there has been a substantial change in material circumstances from the initial disposition order, and, if there has, whether the best interests of the child require termination of parental rights."
 
 In re D.S.
 
 ,
 
 2016 VT 130
 
 , ¶ 6,
 
 204 Vt. 44
 
 ,
 
 162 A.3d 1254
 
 . "A substantial change in material circumstances is most often found when a parent's ability to care for a child has either stagnated or deteriorated over the passage of time."
 
 In re S.W.
 
 ,
 
 2003 VT 90
 
 , ¶ 4,
 
 176 Vt. 517
 
 ,
 
 833 A.2d 879
 
 (mem.) (quotation omitted). "Stagnation may be found if the parent has not made the progress expected in the plan of services for the family despite the passage of time."
 
 In re D.M.
 
 ,
 
 2004 VT 41
 
 , ¶ 5,
 
 176 Vt. 639
 
 ,
 
 852 A.2d 588
 
 (mem.). However, this Court has repeatedly emphasized that "stagnation caused by factors beyond the parents' control [can] not support termination of parental rights."
 
 In re D.S.
 
 ,
 
 2016 VT 130
 
 , ¶ 7,
 
 204 Vt. 44
 
 ,
 
 162 A.3d 1254
 
 (quotation omitted). "We will affirm the [family] court's findings in support of changed circumstances unless they are clearly erroneous, and its conclusions if reasonably supported by the findings."
 
 Id
 
 . ¶ 6.
 

 ¶ 69. I suggest that the State failed to show by clear and convincing evidence that there had been a substantial change in
 circumstances to support the court's findings that stagnation had occurred or that father engaged in physical abuse. More disturbing, if there is stagnation on the part of father in this case, then we may as well stop pretending that the goal in juvenile judicial proceedings is preservation of the family. From the time reunification with father was added to the disposition plan, father did everything asked of him. DCF denied every suggestion made by father that he believed might promote healing for the children and the family. Did DCF consider that the children might be enthused about reunification with father if they had seen his new living situation, a clean, "appropriate" house? He was reprimanded for showing the children photographs of the new beds he bought for them. Would the children have benefited from meeting father's new partner, a major departure from their mother and her many issues? Why was he not allowed to have visitation with one child at a time, why must it have been a mass visitation with multiple children at one time where little intimacy could occur?
 

 ¶ 70. Throughout this matter, the State and DCF continued to tumble together phrases of domestic violence and domestic abuse, failing to recognize the distinction articulated by Judge Hoar in the disposition hearings and decision, and insisting father admit to something he denied. Whatever evidence the court below thought existed concerning physical abuse cannot be considered clear and convincing, especially because mother testified to many obnoxious, controlling behaviors by father but adamantly denied he was ever physically abusive to her. This decision should not stand.
 

 The court found that father did not intend to scare or threaten anyone.
 

 "We don't want to create a situation where we're saying you have to be completely done by this date and oh, by the way, we're not going to let you, because we're pumping the brakes on everything that would get you there. I mean, that would be ... artificially be creating a situation where TPR would happen."