VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org

Case No.        25-AP-044



*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant.  Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

JULY TERM,   2025

| | |
|---|---|
| In re A.B. & B.B., Juveniles<br>(A.B., Father\*) | } APPEALED FROM:<br>}<br>} Superior Court, Chittenden Unit,<br>} Family Division<br>} CASE NOS. 23-JV-00066 & 23-JV-00067<br>Trial Judge: Kate T. Gallagher |

In the above-entitled cause, the Clerk will enter:

Father appeals a trial court order terminating his parental rights in daughter A.B., born in September 2015, and son B.B., born in July 2018.  We affirm.

### I.  Background[1]

In December 2022, the Vermont Department for Children and Families (DCF) received reports that A.B. and B.B. had been absent for a significant portion of the school year and that the home they lived in was hazardously unclean.  Father was no longer residing in the home and mother had sole legal and physical parental rights and responsibilities for the children; DCF was concerned that she was unable to meet their needs for food and medical care.  The following month, the State filed petitions alleging that A.B. and B.B. were children in need of care or supervision (CHINS).  Father was incarcerated at the time.  The court placed the children with father's aunt, T.H., under a conditional custody order.

In June 2023, the family division determined that A.B. and B.B. were CHINS at the time of the State's petitions.  By this time, father had been released and he stated that his goal was to reunify with the children.  In July, DCF filed a disposition case plan calling for reunification with either parent by November 2023.  Father's action steps included: engaging with DCF; attending in-person visits with the children as well as their medical appointments, school meetings, and shared-parenting meetings; and working with Easterseals to develop his parenting skills.

---

[1]  Mother voluntarily relinquished her parental rights in the children and did not appeal the court's termination order.  We therefore focus here on the factual and procedural background relevant to father.

DCF amended the case plan in September 2023 to extend the reunification timeline by three-to-six months and add certain action steps. The agency had recently learned that father had been hospitalized several times—and was told, but could not confirm, that these hospitalizations resulted from drug overdoses. Accordingly, the amended plan called for father to engage in a substance-use assessment and comply with any resulting treatment recommendations. It also required father to obtain housing, as it had become clear that he no longer had a stable residence. The court adopted the amended plan in December 2023.

In April 2024, the State filed petitions to terminate parents' rights in A.B. and B.B. The following July, the court transferred custody of the children to DCF, though they remained in T.H.'s care as a foster placement. The court held a termination hearing in November 2024. Mother voluntarily relinquished her rights in the children. Father contested the State's petitions, and the court heard testimony from father, T.H., and three DCF workers involved in the case. It subsequently issued a written decision including the following factual findings.

When she began to care for the children in January 2023, T.H. observed that B.B.—then four years old—was nonverbal, had a flat affect, did not make eye contact or respond to stimuli, and had difficulty chewing, occasionally choking on his food. He had spent much of his early life confined to a highchair and could barely walk. After pursuing medical treatment for B.B., T.H. learned that he has chromosomal abnormalities, autism, and developmental and fine-motor issues. A.B., while relatively healthy, had also experienced developmental delays. She was academically behind after missing valuable time in school. She had also become parentified due to acting as B.B.'s caretaker for most of her life and focused on the emotional needs of those around her to the exclusion of her own. Although father had lived with mother and the children until shortly before the reports giving rise to the State's petition, he asserted that he was unaware of B.B.'s developmental delays or other issues of concern in the home because he worked long hours, leaving mother to care for the children. He assumed that she had been taking them to medical appointments and meeting their needs.

Father's initial engagement with DCF waned over time. The agency attempted to help him apply for housing and related financial support, but father did not submit the applications. He continued to "couch surf," changing residences every few days. Though father indicated that he was trying to save money and secure stable housing, he had been unable to accrue the necessary funds and could not identify any concrete steps he had taken to obtain housing through any community provider.

Father did not attend shared-parenting meetings or work with Easterseals or other providers to develop his parenting skills. He did not attend the children's medical or educational appointments, despite B.B.'s significant ongoing needs. T.H. provided father with information about these appointments, but when father was encouraged to reach out directly or attend the visits, he did not do so.

Between March and October 2023, father spent weekends with the children at T.H.'s home. That November, however, he began working long hours for a taxi company and stopped visiting the children regularly because he prioritized his work over his visits. He often failed to provide notice that he would not attend scheduled visits, causing A.B. to become upset and dysregulated. He maintained contact with the children primarily through phone and video calls. While A.B. enjoyed the calls, B.B.'s age and developmental needs largely prevented him from engaging with father remotely. By the time of the termination hearing, there had been little

2

meaningful contact between father and the children for many months. Father cared about the children, but did not have a strong bond with them.

Father never participated in a substance-use assessment. Although he acknowledged overdosing on multiple relatively recent occasions, he minimized the seriousness of these potentially fatal events. Father believed that his substance use was recreational and did not feel an assessment was necessary. While father stated that he had since become sober and provided one urinalysis report demonstrating this, he also refused to comply with DCF's requests for random urinalysis tests.

A.B. and B.B. both made significant progress in T.H.'s care. T.H. created a team of medical and educational professionals to meet B.B.'s needs, advocating for him to ensure he received appropriate services. By the time of the final hearing, B.B. had braces for his legs and eyeglasses to correct his vision. His mobility and coordination had improved, he was learning to express himself verbally and through sign language, and he was able to make eye contact and engage with others. He still needed constant, close supervision and would never be able to live alone or fully care for himself. T.H. had helped A.B. become less parentified and focus on her own emotional needs, ensured that she received therapy to help her navigate her complex emotions, and arranged for her to have surgery to remove several rotting teeth. T.H. was working with A.B. at home to address her educational deficits, and A.B. was making educational and social gains at her new school.

Though father had had eighteen months to make progress on his action steps, he failed to do so. T.H. and DCF both explained to father that—in order to be a single parent—he would need to find a work-life balance that that would allow him to be available to his children and attend the appointments and meetings necessary for their growth and development. However, he remained unhoused and overworked, with no time to parent and no plan to address these foundational issues. Father conceded that he did not prioritize the actions necessary to become capable of parenting his children. Just as he had once focused on his work and left the children's care to mother, he had again focused on his work and left the children's care to T.H.

The court concluded that, due to father's stagnation in his progress toward reunification, there had been a substantial change in material circumstances sufficient to consider modification of the disposition order. It weighed the statutory factors and concluded that it was in the children's best interests that father's parental rights be terminated. This appeal followed.

## II. Discussion

When the State moves to terminate parental rights after disposition, the family court undertakes a two-step analysis. In re D.S., 2016 VT 130, ¶ 6, 204 Vt. 44; 33 V.S.A. § 5113(b). It must first determine whether "a change in circumstances requires such action to serve the best interests of the child." 33 V.S.A. § 5113(b). Changed circumstances are "most often found when a parent's ability to care for a child has either stagnated or deteriorated over the passage of time." In re S.W., 2003 VT 90, ¶ 4, 176 Vt. 517 (mem.) (quotation omitted). Where the § 5113(b) threshold is met, the court goes on to consider whether termination is in the child's best interests under the statutory criteria at 33 V.S.A. § 5114(a). "The State has the burden of proof at both stages and, as to each point, must meet its burden by clear and convincing evidence." In re R.W., 2011 VT 124, ¶ 15, 191 Vt. 108 (quotation omitted).

"The decision to terminate parental rights is committed to the discretion of the family court." In re D.M., 162 Vt. 33, 38 (1994). Provided the court applied the proper standard, we will not disturb its findings unless clearly erroneous and will affirm its conclusions if supported by those findings. In re N.L., 2019 VT 10, ¶ 9, 209 Vt. 450.

On appeal, father challenges only the first step of the family court's analysis: its determination that that there had been a change in circumstances due to his stagnation. "The key question for the court when considering whether stagnation has occurred is whether the parent has made progress in ameliorating the conditions that led to state intervention." In re D.M., 2004 VT 41, ¶ 7, 176 Vt. 639 (mem.). The court cannot, however, base a conclusion of changed circumstances on "stagnation caused by factors beyond a parent's control." Id. Father argues that this was the case here.[2] He asserts that his financial circumstances, full-time work obligations, and transportation difficulties prevented him from securing housing or maintaining consistent visitation with the children, and that DCF failed to consider these realities in drafting the case plan.[3] These contentions are simply not supported by the record.

We begin with the case plan and DCF's broader efforts to help father satisfy its objectives. Father was not present at the disposition hearing at which the plan was adopted. However, his attorney indicated that she understood his position on the plan and raised no objection to the action steps and corresponding timeline set forth therein; in fact, she expressed appreciation for several provisions that accommodated his heavy work schedule. The DCF worker assigned to the case when the plan was adopted testified that because father missed the disposition hearing, she arranged a meeting with him to review the action steps and reiterate what the agency was looking for from him in order to support reunification. Father conceded that, at this meeting, he agreed to ongoing monthly meetings with the DCF worker to ensure he was on track with his case-plan goals but failed to follow through with this commitment. He

---

[2] The State contends that this issue is not preserved for our review on appeal because father did not raise it during the termination hearing. See In re D.C., 157 Vt. 659, 660 (1991) (mem.) (recognizing that in juvenile proceedings, arguments not raised below are not preserved for appeal). The State does not explain, however, how father could be required to challenge the basis for the court's stagnation determination during the hearing, given that the court had yet to announce its decision at that time. In any event, we do not consider the State's preservation argument because assuming father's contention was preserved, it is without merit.

[3] Father acknowledges that the court's changed-circumstances determination was based only "in part" on his failure to secure suitable housing and lack of consistent visitation. As noted above, the court found that father failed to engage with any of his action steps, including the requirements that he attend appointments and meetings for the children, participate in a substance-use assessment, and engage with providers like Easterseals to develop his parenting skills. We "employ[] the harmless error standard in termination cases, and, under that standard, an error warrants reversal only if a substantial right of the party is affected." In re R.W., 2011 VT 124, ¶ 17 (quotation omitted). "For example, where a finding of fact that supports the conclusion of the court is clearly erroneous, we find harmless error if other valid findings also support the court's conclusion." In re G.F., 2007 VT 11, ¶ 14, 181 Vt. 593 (mem.). We need not consider here whether the court's stagnation determination could stand independent of its conclusions regarding housing and visitation, however, because the record does not support father's argument that his failure to make progress in those aspects of the case plan was attributable to factors beyond his control.

initially indicated that this was due to transportation issues, but subsequently agreed that he could have taken the bus to get to these meetings but did not do so because he "wasn't prioritizing this right." Father also agreed that DCF had been communicative with him and generally accommodated his need to meet remotely at times. The DCF worker testified that whenever she brought up father's action steps, he responded that he understood what he needed to do and how to do it. She explained that her work with father "sort of disintegrated" not because she did not want to meet with him or support his reunification efforts, but because it became increasingly difficult to get in contact with him over time.

Father argues that his lack of consistent visitation with the children was attributable to his transportation difficulties—including his inability to afford a vehicle—and work obligations. At the hearing, however, father testified that T.H. was "pretty open" to father visiting A.B. and B.B. whenever he was available and acknowledged that even during a period in which he was unemployed, he did not consistently visit the children. The DCF worker explained that she would have provided father with transportation vouchers on request, but he never asked—noting that, at the time, the bus was free. Father further testified that he had been charged with driving under the influence in June 2024 and, as a result, lost his license. The DCF worker explained that after the children were placed in DCF custody the following month, the agency attempted to contact father to arrange for visits at one of its offices but was unable to reach him over the course of a week. She testified that she ultimately heard from him after reaching out to his attorney and arranged a time for the visits that father was satisfied with, but he only attended half of these visits, at times failing to provide notice.

Father also asserts that he was unable to find suitable housing "through no fault of his own." In support of this allegation, he points to evidence outside the record pertaining to a lack of housing for low-income individuals in the state. But see Hoover v. Hoover, 171 Vt. 256, 258 (2000) (explaining that this Court's "review is confined to the record and evidence adduced at trial" and "[o]n appeal, we cannot consider facts not in the record"). The DCF worker did explain, however, that she understands that finding housing is difficult and tells the parents she works with that "if that's the only thing you're working on, that's not a reason to prevent reunification." Father testified that he filled out Burlington Housing Authority and Vermont State Housing applications provided by DCF, but never dropped them off, noting that he "probably need[ed] new copies" because his had since been "ruined [by] the weather." The DCF worker testified that while the agency could have helped father apply for a family unification voucher—which can prioritize housing vouchers for parents working toward reunification—it was ultimately unable to provide the requisite letter of support because father had disengaged with DCF and was no longer making progress toward reunification. In his testimony, father agreed that to some extent, the ball had been in his court with respect to housing, but he had not done what he needed to do.

Father also agreed that he did not connect with any services that could help him overcome his financial obstacles. He testified that he understood the disposition case plan laid out the steps he needed to take to reunify with the children, but did not think that it was important to follow the plan because "I just don't feel like it's the right thing to be looking at."

The record in this case is replete with evidence that DCF was ready and willing to support father in his efforts to reunify, including by connecting him with supports to help him find affordable housing, assisting him with his transportation difficulties, and accommodating his work schedule, but father did not avail himself of this help or prioritize the steps he knew he

needed to take to reunify with his children. As a result, he has not shown that his failure to secure housing and see his children consistently was attributable to factors beyond his control. The court therefore did not err in weighing these considerations—among others—in determining that there had been a change in circumstances due to father's stagnation.

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice


_____
Karen R. Carroll, Associate Justice


_____
Nancy J. Waples, Associate Justice