NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2018 VT 132

No. 2018-198

| | |
|---|---|
| In re D.F., H.F., M.F. and D.F., Juveniles | Supreme Court |
| | On Appeal from Superior Court, Addison Unit, Family Division |
| | October Term, 2018 |

Helen M. Toor, J.

Sarah R. Star of Sarah R. Star, P.C., Middlebury, for Appellant Father.

Thomas J. Donovan, Jr., Attorney General, Montpelier, and Martha E. Csala, Assistant Attorney General, Waterbury, for Appellee Department for Children and Families.

PRESENT: Reiber, C.J., Skoglund, Robinson and Eaton, JJ., and Grearson, Supr. J., Specially Assigned

¶ 1. **ROBINSON, J.** Father appeals termination of his parental rights to his four children. On appeal, father raises three arguments regarding the court's termination decision: (1) the termination of parental rights (TPR) petition was premature because the three-month period for reunification provided for in the case plan had not expired and the Department for Children and Families (DCF) had not made reasonable efforts to reunify father with the children insofar as it refused to make the children available for expanded visitation that would have enabled reunification to occur; (2) the evidence does not support the court's determinations that father's progress had stagnated and that father would not be able to parent in a reasonable period of time; and (3) several specific findings are unsupported by the evidence. He separately appeals the trial court's "reasonable efforts" finding. We affirm.

¶ 2.    The relevant procedural and factual background is as follows.  Father and mother were married for ten years and had four children, Dy.F., born in April 2006, H.F., born in March 2007, M.F., born in February 2009, and Da.F., born in February 2010.  DCF has been involved with the family since the children were born.

¶ 3.    In June 2016, the State filed a petition alleging that the children were in need of care or supervision (CHINS) due to allegations of medical neglect, unsanitary conditions in the home, neglect of the children's hygiene, verbal abuse of the children by father, and verbal and physical abuse of mother by father.

¶ 4.    The court transferred custody to DCF.  In August 2016, parents stipulated to the merits of the CHINS petition, agreeing that they were not meeting the children's medical needs, that mother's unmet mental-health issues left her unable to protect the children from risk of harm, and father's preoccupation with mother prevented him from meeting the children's needs. DCF's proposed disposition case plan called for concurrent goals of reunification with mother or adoption.  By the time of the initial case plan, mother was residing separately from father and living with a boyfriend in New Hampshire.  The plan of services called for father to, among other things, complete a batterer's intervention program during which it would be expected that he would acknowledge his history of violence and demonstrate how to safely parent his children without the use of violence.  Although father did not oppose many of the expectations in the case plan, he denied that he engaged in domestic abuse and would not agree to the proposed case plan requiring that he complete domestic-violence programming.

¶ 5.    After a contested disposition hearing, on December 22, 2016, the court found by a preponderance of the evidence that father engaged in a pattern of domestic abuse, directed primarily at mother, that father on at least one occasion physically abused mother, and that there was a "clear pattern of emotional abuse and controlling behavior."  Consequently, the case plan adopted by the court at disposition called for father to complete the Domestic Violence to

2

Responsible Choices (DVRC) program, in addition to more than a dozen other expectations. The concurrent case-plan goals approved by the court were reunification with mother or with father or adoption.[1]

¶ 6. Father engaged in the required programming and attended weekly visits supervised by WomenSafe. At the post-disposition review at the end of February 2017, father, through his lawyer, expressed a desire to increase visitation time, perhaps on the weekends with members of his family supervising, so that they were not constrained by the limits on available independent supervisors. The State represented to the court that DCF had concerns about relying on members of father's family as supervisors because father's family continued to minimize or deny that there was any kind of domestic abuse. The court urged the parties to work together, and invited father to file a motion if he felt DCF was being unreasonable.

¶ 7. In late March 2017, DCF convened a safety-planning meeting in response to concerns expressed by the respective foster parents that father was showing up at locations where he knew the children or their foster families would be outside of set visitation times. Following that meeting, DCF provided father with written guidelines that provided, among other things, that father was authorized to have contact with the children only through the scheduled visitation and phone calls; father was not be in any community location in which it would be reasonable to assume that the children might be unless preapproved by DCF; that father should not, without preapproval from DCF, go to any venue or event where the foster parents would likely be, and should leave without having to be asked if he found himself at a venue or event with them; and that father should not be in the physical vicinity of either foster home.

---

[1] DCF's proposed case plan did not contemplate reunification with father. The court added that concurrent case-plan goal on its own initiative. Although the court should have rejected the proposed case plan and ordered DCF to prepare a new one, rather than itself imposing a case-plan goal not reflected in the proposed case plan, 33 V.S.A. § 5318(b), the State did not appeal the disposition order and does not on appeal challenge the court's imposition of a concurrent case-plan goal of reunifying the children with father.

3

¶ 8.     In April 2017, father formally requested additional visits with the children, to be supervised by specified relatives. At the time, father had one visit a week with all four children for two-and-a-half hours supervised by Easter Seals.

¶ 9.     The court held a hearing on May 30, 2017 to consider father's motion and to have a permanency-planning hearing. At the hearing all parties agreed that DCF made reasonable efforts to finalize the permanency plan and stipulated to a new case plan with an anticipated reunification goal of three months. The court and the parties spent most of the time discussing father's request for additional visits supervised by his relatives. The State was not averse to eventually increasing father's visit time with supervision by a specified family member but did not support an immediate order providing for such visits. The State noted that father had only had one Family Time visit supervised by Easter Seals, had just finished his first visit with all four children at once in over a year, represented that the clinical treatment team did not support extended-family supervised visits at all, said it would defer to the treatment providers as to when the children were ready for extended-family visits, and emphasized that if father wanted extended family to serve as supervisors, then those family members needed to make contact with the children by letter. The children's attorney indicated that the children wanted more time with their father and urged that when Easter Seals and DCF concluded that the visits had progressed with father to the point where he could have some weekend time, the additional visits take place in Middlebury, rather than Newfane, where father's grandmother lived. Father emphasized that increased visits were essential for him to realistically meet the three-month permanency goal approved by the court that day and advocated for an order that provided for the additional visits beginning at a date certain, rather than an open-ended order deferring to other providers. In response to father's concerns about the short window he faced for reunification, the State reassured father and the court that father did not have to be prepared for reunification by that time; he only needed to demonstrate significant progress moving forward.

4

¶ 10.    At the close of the hearing, the court summarized the collective plan, explaining that DCF was to: provide a letter summarizing the expectations father would have to meet to progress to visitation beyond the Easter Seals regime, including continued progress in DVRC; provide notice of the expectation that any potential supervisor from father's family make some kind of communication so the kids would be comfortable with that person in a supervisory role; and convene a team meeting by June 30 that parents, counsel, and any extended family supervisor could attend to check in concerning the parties' progress.   The court set a status conference for July 11, with the expectation that by then enough progress would be made to allow the court to approve additional supervised visits.

¶ 11.    In June, after the boys' foster mother secured a temporary stalking order against father in a different docket, the State, with the support of the juveniles, filed a motion for a juvenile protective order restricting father's contact.[2]   Father responded with a request for a juvenile protective order against the foster parent, as well as a request to transfer custody of the boys to his aunt.  He alleged that foster mother's conduct in filing a stalking complaint against him was detrimental to the boys, and that the boys had become alienated from him and that visits had been canceled.  In his motion, father indicated that he would be filing a modified motion to transfer custody of the girls from a different foster-care provider to his aunt, but explained that the situation with the boys' foster mother required urgent, rather than gradual, action.

¶ 12.    At the June 30 hearing on the respective requests, the boys' foster mother testified about various instances in which father had appeared at or near events where foster mother and the boys were present and described the impact of father's presence at various places on the boys' sense of security.  Father offered a mix of harmless explanations for his presence on such

---

[2] Upon finding that a person's conduct is or may be detrimental or harmful to a child, the court in a juvenile proceeding may issue a protective order restraining or otherwise controlling the person's conduct.  33 V.S.A. § 5115(a).  A person who intentionally violates such an order concerning contact between the child and that person is subject to punishment pursuant to 13 V.S.A. § 1030, the statute that applies to violations of abuse-prevention orders.  33 V.S.A. § 5115(e).

occasions and a denial of some of the secondhand reports to which foster mother had alluded in her own testimony. The court did not make findings because the parties did not finish presenting their evidence, but at the end of the hearing father acknowledged the court's admonition that father should closely follow the March 2017 DCF guidelines governing his contact with the children. Father and the State eventually dropped their respective requests for a protective order and the court heard no further evidence specifically directed to those requests.

¶ 13. At the July 11 status conference, DCF was not ready to support additional visits between father and the children supervised by father's aunt. The children had not yet received the letters father's aunt had written each of them to reestablish a relationship, and the team meeting that was to take place by June 30 had not happened. The court concluded that DCF was not "put[ting] on the brakes," but just needed more time for understandable reasons, and deferred the question of expanded visitation supervised by father's aunt. In response to father's sense of urgency given that the remaining time in the permanency plan was passing, the court reassured father that as long as father was trying to engage and do what the plan calls for, he would not lose his chance at reunification due simply to the mere passage of time and circumstances beyond his control. In the meantime, the competing motions for a protective order and father's motion to transfer custody to his aunt remained pending.

¶ 14. On July 26, father filed a revised motion to transfer custody of all four children to his aunt. The next day, the State filed a petition to terminate father's residual parental rights.[3]

¶ 15. Following three days of hearings in February and March 2018, the trial court made the following findings. At the time of the CHINS petition the home was in "utter chaos" with dog feces and cat urine on the floors, dirty clothes and dishes everywhere, and a strong offensive odor. The children went to school filthy and smelly, and had lice for extended periods

_____

[3] The State's TPR petition also applied to mother. At the outset of the termination hearing, she voluntarily relinquished her parental rights, conditioned on termination of father's parental rights.

of time.  Other children did not want to play with them.  Mother and father argued almost daily, and the children witnessed verbal, mental, and emotional abuse.  In front of the children, father called mother a host of insulting and offensive names.  He regularly forced mother to have sex by denying her necessities such as gas money.  Father was controlling and manipulative of mother; he stalked mother and was jealous and angry.

¶ 16.  With respect to physical abuse, the trial court credited the out-of-court statements of several of the children, described in court by the DCF caseworker, suggesting that father physically abused mother.  In particular, the DCF worker testified that H.F. had reported that there was lots of fighting in the home and that "Daddy was bigger so he didn't get bruises but Mommy got bruises;" that M.F. described to a preschool teacher (who then apparently relayed the report to the DCF caseworker) a "boo-boo bear" that "Mommy puts on the bruises that Daddy gives her"; and Dy.F. reported that there was lots of hitting and kicking between his parents and by the parents upon him.  The court found these reports to be reliable hearsay because of the consistency of the reports, the children's lack of a motive to lie, and the admitted emotional abuse and physical manifestations of trauma in the children.

¶ 17.  A theme of the mother and father's relationship near the end was father's (accurate) belief that mother was cheating on him, and his jealous and possessive behavior.  The trial court made a finding about father being so angry at mother for wearing a dress he believed she was wearing to impress another man that he drove her to a remote location, with the kids in the car, ripped it off her and burned it while the children watched.  During this time period, he called her up to fifty times a day to check on where she was and what she was doing.  On one occasion he woke the children up and drove around with them in the car until 1:00 a.m. looking for mother.

¶ 18.  The trial court found that father had made many significant, positive steps to address his behaviors that led to the CHINS petition.  He completed the DVRC class and the

Nurturing Parents class, did a mental-health assessment, and was extremely consistent in visitation. He was able to testify at the hearing about the impact his emotional abuse of mother had on the children and was ashamed of his past behaviors. The court was persuaded that father had learned a lot, and credited father for his progress.

¶ 19. However, the court identified numerous deficiencies in father's progress as well. The court found that in his hearing testimony, father on multiple occasions sought to minimize his behavior. Explaining the pre-petition conduct of awakening the children at 1:00 a.m. and driving around looking for mother, father incredibly explained that he needed medications for one of the children that mother had, and he needed the children's car seats that were in her car. Father denied that he was "obsessed" with mother when he called her fifty times a day, and instead explained that he was "preoccupied" with his relationship with her—a clarification the court saw as an attempt to minimize his behavior. He continued to deny reports of some pre-petition behavior—including threatening to have his stepfather rape mother and physical abuse of mother. And even at the hearing, father minimized his own responsibility for the squalid conditions the children had lived in, continuing to blame mother for the condition for the home, and emphasizing that he left early for work so did not know what condition the children were in when they left for school.

¶ 20. With respect to his alleged "stalking" of the foster parents and children while they were in foster care, the court was persuaded by father's explanations on some of the issues raised in the hearing testimony and concluded that father did not intend to scare or threaten anyone. However, the court concluded that father had repeatedly shown a lack of understanding about how his conduct might affect the children, who needed predictability and were affected by his appearing places where he was not expected. The court noted that one of the children had recently stated that father was "still stalking us" and expressed a desire for it to end. The court saw father's behavior as evidence of his putting his own desire to see the children ahead of

considering their needs, and of a lack of insight into the trauma he can cause even without intending to.

¶ 21. And with respect to father's continuing controlling behavior, the court found that as recently as the weeks before the hearing, mother changed her telephone number because of father's frequent calls after she had repeatedly told him to leave her alone. The court concluded, "He clearly has not fully grasped the idea of respecting others' rights to control their own lives rather than letting him control them."

¶ 22. The court described the children's progress in foster care. The girls, H.F. and M.F., were placed in a foster home together. They had sleep issues and had not learned proper hygiene. The boys, Dy.F. and Da.F., were placed together in a different foster home. Dy.F. had hygiene issues and a stress-induced allergy. He was below grade level for academics. Da.F. was diagnosed with attention deficit hyperactivity disorder (ADHD), anxiety, and depression. He was below grade level and had impulse-control issues. He had nightmares after father raised his voice at a visit. All the children have improved dramatically since going into DCF custody. They feel safe, their behavior has stabilized, and they have good hygiene. They are less parentified and are able to act like children. The children do not do well when all four are together, and their clinicians opined that it would be very challenging for all four to live together again.

¶ 23. Father was reliable in visiting the children. However, the court credited testimony from both the DCF caseworker and the Easter Seals worker that in visits, the children tended to seek emotional support from the visit coaches rather than father, suggesting that the coaches had been able to create emotional bonds that the children trusted more than the bonds with their father.

¶ 24. Based on the above and other findings, the court found that father's progress had stagnated. Although he had made significant gains, and had completed all the programming

9

called for by the case plan, father still minimized his past conduct in important ways, failed to move past some of his controlling behavior, failed to take responsibility for his physical abuse of mother, and failed to take responsibility for the extreme neglect of the children that was one of the key aspects of the case.

¶ 25. The court further found that termination was in the children's best interests. Father demonstrated commitment to the children, but their relationships with him were complicated by their past trauma. They are strongly bonded to their foster parents and siblings, have stability and safety, and are settled in their schools and communities. With respect to the father's ability to parent in the future, despite father's laudable progress, he would not be ready to resume parenting them within a reasonable period of time as measured from the children's perspective. Even though nearly two years had passed since the children were in taken into DCF custody, father had not fully acknowledged his role in the neglect and abuse to which he exposed the children, and the children did not look to father first to soothe them during their visitation. In fact, one child did not want to have further contact with father. The court noted that the guardians ad litem supported termination of father's rights based on the children's need for stability, father's inability to currently parent them, and the amount of time that had passed, but that they would support a four-to-six-month deadline for father to resume parenting if termination was not granted.[4]

¶ 26. The court also denied father's request for a conditional-custody order with his aunt or grandmother. The court found that it would create too much trauma to move the children from their current placements.

---

[4] The statement of the guardians ad litem was not entirely clear as to whether they supported immediate termination. They said that the process had taken too long already and emphasized the children's need for stability. They were especially concerned about the prospect of it dragging on indefinitely into the future and noted that father had "an awful lot" to do before he could parent them properly. They urged the court to put a time limit on father's opportunity to develop his relationship with the children and suggested four to six months as a firm deadline after which there would be no further extensions.

¶ 27. Following its order terminating father's parental rights, the trial court, by separate order, made a finding by the preponderance of the evidence that DCF had made reasonable efforts to finalize the permanency plan.[5] Father appeals both the termination of his parental rights and the order reflecting the "reasonable efforts" finding.

¶ 28. With respect to the termination of his parental rights, father argues that the termination petition and order were premature because father had not yet had the chance to expand his visitation, and contends that the evidence does not support the trial court's conclusions that father had stagnated and that he was not likely to be able to resume parenting within a reasonable time, and challenges several specific findings.

¶ 29. When the termination of parental rights is sought after the initial disposition, the trial court must conduct a two-step analysis. In re B.W., 162 Vt. 287, 291, 648 A.2d 652, 654 (1994). The court must find first that there has been a change in circumstances; and second, that termination of parental rights is in the child's best interests. Id. "A substantial change of circumstances is most often found when a parent's ability to care for a child has either stagnated or deteriorated over the passage of time." In re D.S., 2016 VT 130, ¶ 6, 204 Vt. 44, 162 A.3d 1254 (quotation omitted). "Stagnation may be found when the parent has not made the progress expected in the plan of services . . . despite the passage of time." Id. (quotation omitted). In assessing the child's best interests, the court is guided by the statutory criteria. 33 V.S.A. § 5114. The most important factor is whether the parent will be able to resume parenting duties within a reasonable period of time. In re J.B., 167 Vt. 637, 639, 712 A.2d 895, 897 (1998) (mem.).

¶ 30. "As long as the court applied the proper standard, we will not disturb its findings unless they are clearly erroneous, and we will affirm its conclusions if they are supported by the

_____

[5] The court issued this order one day after the court granted the petition to terminate father's rights on May 7, 2018. Although the court had decided the termination petition the previous month, it was not processed by the clerk or sent to the parties until May 7, 2018.

11

findings." In re G.S., 153 Vt. 651, 652, 572 A.2d 1350, 1351 (1990) (mem). "Our role is not to second-guess the family court or to reweigh the evidence, but rather to determine whether the court abused its discretion in terminating" a parent's rights. In re S.B., 174 Vt. 427, 429, 800 A.2d 476, 479 (2002) (mem.).

## I.  Timing of TPR Petition and Efforts to Expand Visitation

¶ 31.  We conclude that in this case the TPR petition was not premature simply because DCF filed it during the three-month period subject to the permanency plan then in effect and that DCF did not unreasonably thwart father's progress toward reunification by declining to expand visitation.

¶ 32.  In arguing that DCF's petition was premature because it preceded the end of the three-month period covered in the most-recent case plan, father relies on our decision in In re D.S., 2016 VT 130.  In In re D.S., this Court reversed the trial court's termination of parental rights where DCF shifted to an adoption-only goal and withdrew the Family Time coaching services to be provided to the mother pursuant to the court-approved case plan several months before the target reunification date in the case plan.  2016 VT 130, ¶¶ 10-14.  In light of the trial court's finding in In re D.S. that the mother was progressing in Family Time coaching when those services were withdrawn before the expiration of the case plan period, we concluded that the withdrawal of services was premature and it was impossible to tell whether this had inhibited further progress by the mother.  Id. ¶ 14.  We reversed the court's order terminating mother's parental rights.  Id.

¶ 33.  This case is different.  Although the State filed a TPR petition about a month before the case-plan end date, DCF did not inhibit father's further progress by withdrawing services or ending visitation.  In fact, father continued to have weekly Family Time visits through the final hearing, giving him ample opportunity to continue progressing toward reunification.

12

¶ 34.    Father's deeper argument is that the TPR petition was premature because he had not been allowed frequent visits, including visits in the community and with his family.  He focuses on the fact that through the spring of 2017, and right up until the State filed a TPR petition at the end of July, he persistently sought more visitation time, but the court did not order increased visitation time and DCF continued to resist allowing it.  Father argues that because he has thus far been denied the opportunity to deepen his bonds with the children through more frequent and higher quality visits, termination was premature.

¶ 35.    Father misapprehends the thrust of the trial court's analysis.  The trial court's stagnation analysis did not turn primarily on the lack of progress in the quality of father's relationship with children, but instead hinged on father's inadequate progress, despite an extensive roster of services, in addressing the pre-CHINS-petition behaviors that contributed to the CHINS determination.  Despite father's participation in the various services provided to him, he still engaged in controlling behavior and failed to adequately accept responsibility for the abuse and extreme neglect of the children.  Likewise, the court's conclusion that father was not likely to be able to resume parenting duties within a reasonable period of time turned on the inadequacy of father's progress remedying his pre-petition behaviors, and the fact that even with the weekly contact father did have, the children turned primarily to other adults during Family Time coaching for comfort and soothing.  Father's theory is that the unreasonable denial of increased visits was the major impediment to reunification and if he could only have more time with the children, then their relationship would blossom.  The trial court's analysis, by contrast, suggests that the main impediment to reunification was father's failure to make the progress in his own personal development and in his relationships with the children that would have opened the door to additional visits and ultimately reunification.  Implicit in the trial court's analysis, made explicit with its post-judgment "reasonable efforts" determination, was that DCF's refusal to expand father's visitation was reasonable.

¶ 36. Despite the progress father made, and the tenacity with which he sought expanded visitation, sufficient evidence supports the trial court's implicit rejection of the arguments that father was wrongly prevented from having increased visits supervised by his aunt, that DCF's conduct inhibited father's reunification, or that increased visits would have solved the problems that prevented reunification in this case. The evidence at the time supported the court's decision that the children were not ready for increased visits supervised by relatives in May 2017, including that father had just had his first supervised visit with Easter Seals, the children were not sufficiently reacquainted with their aunt, and some clinicians advised against expanded visits. And evidence at trial supports the conclusion that declining to expand the visits with supervision by father's aunt was reasonable. The caseworker testified that there had been only limited communication between the children and aunt[6] and the children did not want to see the relatives or father. Moreover, testimony at trial from clinicians and foster parents was that the once-per-week visits were disruptive and emotionally challenging for the children. For these reasons, we reject father's arguments that the TPR petition was premature and that father was inhibited in his progression toward reunification by the limitations on his time with the children.

II. The Trial Court's Stagnation and Resumption-of-Parenting Analyses

¶ 37. We conclude that the evidence was sufficient to support the trial court's stagnation determination and its conclusion that father would not be able to resume parenting in a reasonable time. Father challenges the trial court's findings that he had not fully accepted responsibility for his pre-petition conduct, asserting that the record clearly shows that he complied with all case-plan requirements, and fully acknowledged the abuse and neglect and accepted responsibility. He argues that the court's focus on his pre-petition conduct was improperly backward, rather than forward, looking.

---

[6] There was apparently some confusion about who would communicate to father's family members that they were to send letters to reestablish contact. Consequently, letter writing did not begin until later than contemplated and, at the time of the final hearing, the children had only received one letter from aunt and had not chosen to respond.

¶ 38.    Although there may have been conflicting evidence, and the trial court could have reached different conclusions on this record, we conclude that evidence in the record supported the court's assessment that father had not made the progress required by the case plan and that he would not be able to resume parenting in a reasonable time.  Our conclusion on this point is heavily informed by the standard of review; our job is not to reweigh the evidence, but is to determine whether the trial court's factfinding was clearly erroneous.  See In re S.B., 174 Vt. at 429, 800 A.2d at 479 (explaining that appellate court does not "second-guess" family court or "reweigh the evidence").  We are mindful that the trial court had the opportunity to hear from the witnesses directly, rather than relying on a cold record, and was accordingly in a better position to evaluate their credibility.  In re A.F., 160 Vt. 175, 178, 624 A.2d 867, 869 (1993) ("We leave it to the sound discretion of the family court to determine the credibility of the witnesses and to weigh the evidence.").  With that in mind, we conclude that sufficient evidence supported the trial court's findings, and the fact that father performed all the tasks required of him pursuant to the case plan does not defeat this conclusion.

¶ 39.    Ample evidence supported the trial court's conclusions that father had not fully acknowledged and taken responsibility for his pre-petition behavior and continued to engage in controlling behavior.  First and foremost, father's own testimony provides support for the trial court's conclusion.  Although he broadly accepted responsibility for calling mother names and being emotionally abusive, his specific answers to various questions suggested that he was not truly owning his behavior.  For example, when asked about the occasion, pre-petition, when he took children out in the car at 1:00 a.m. to search for mother, father suggested that his desires to get one child's medicine and the children's car seats from mother were substantial factors motivating his actions.  When asked whether he had been obsessed with mother pre-petition, father pushed back and explained that he was preoccupied with his relationship with her because he was focused on keeping the family together.  Father denied that he had threatened to have his

15

stepfather rape mother. And, when asked about his children, pre-petition, going to school smelling and with feces on their backpack, father implied that he did not know they were going to school that way because he left for work before they left for school—a claim the trial court could reasonably find not credible. And father denied ever physically abusing mother pre-petition—a denial the trial court found not credible.

¶ 40. The trial court's conclusions are reinforced by other testimony as well. A domestic-violence specialist from DCF interviewed father near the conclusion of his DVRC program. She concluded that he still did not take full responsibility for most of his behaviors, saying that his daughter made things up, putting most of the blame for the condition of the home on mother, and failing to understand that his emotional abuse of mother impacted her ability to parent the children. In addition, the testimony of the facilitator who ran father's DVRC program, while generally supportive of father's efforts, provided support for the trial court's findings. Although the facilitator was favorably impressed by father's admission to a range of abusive conduct, the conduct that she described him acknowledging was generally far less severe than the conduct testified to by mother. For example, whereas mother described father regularly using certain epithets against her in an abusive way, the facilitator described father admitting to laughing when one of his children picked up an unusual epithet and directed it at mother. Where mother described father as denying her gas money and other necessities if she declined to engage in sex with him, the facilitator described father admitting to withdrawing love or affection when mother did not give him what he wanted. The facilitator did not recall him acknowledging that he declined to put gas in the car or threatening to arrange for his stepfather to rape mother.

¶ 41. The court's findings were appropriately forward looking. Determining whether a parent will be able to parent within a reasonable period of time is "forward-looking, that is, the court must consider a parent's prospective ability to parent the child." In re D.S., 2014 VT 38, ¶ 22, 196 Vt. 325, 97 A.3d 882 (quotations omitted). The court's conclusion turned not on

16

father's neglect and abuse pre-petition, but on his prospective unreadiness to assume parenting responsibilities for four highly traumatized children. Even though father had completed all of the programming asked of him, the trial court concluded that he had not adequately internalized the lessons of his DVRC program. Father's parenting deficits that led to the CHINS petition in the first place persisted to a substantial degree—a factor highly relevant to father's ability to resume parenting in a reasonable time. The court properly considered father's prospective ability to parent and did so in light of what was a reasonable period of time from the children's perspective.

### III.  Sufficiency of Findings

¶ 42.   We likewise reject father's arguments that the evidence does not support several other findings. Although there may be countervailing testimony, each of the challenged findings is supported by evidence and therefore not clearly erroneous. See id. (reciting standard of review).

¶ 43.   The court's finding that father exhibited controlling behavior over mother by continually phoning her before the termination hearing was supported by mother's testimony. Mother testified that although she asked him to leave her alone, father called her at least weekly, at times more. She explained that this forced her to change her telephone number.

¶ 44.   The record supports the trial court's finding that father had physically abused mother pre-petition and still refused to accept responsibility. Mother's testimony supported the trial court's findings as to father's controlling behavior and emotional abuse, but she denied that father had physically abused her. In concluding that father had physically abused mother pre-petition, the court credited the hearsay evidence from several children, offered through the testimony of the DCF caseworker, indicating that father did physically abuse mother. Hearsay evidence may be admitted in termination proceedings and may be relied on to the extent of its probative value. 33 V.S.A. § 5317. However, hearsay may not be "the sole basis for termination

17

of parental rights." In re A.F., 160 Vt. at 181, 624 A.2d at 871. Here, the trial court was within its discretion in crediting the hearsay evidence, even though it contradicted mother's in-court testimony. The court offered considered reasons for its decision to credit the evidence—the children had no motive to lie, and the children's accounts were consistent with one another's statements and with the undisputed culture of emotional abuse in the marriage. Moreover, the hearsay evidence was not critical to the trial court's reasoning. Although the court did make a finding that father had failed to acknowledge his pre-petition physical abuse of mother—abuse the trial court concluded had in fact happened—the court also made extensive findings about father's minimization of his emotional abuse of mother and his ongoing controlling conduct. Father's refusal to admit to having physically abused mother was part of the overall picture of denial, or inadequate acknowledgment, that underlay the trial court's termination decision, but it was not the sole, or even the predominant, basis for the court's decision.

¶ 45. The trial court's finding that father incredibly denied his motives in taking the children in the car to look for mother at 1:00 a.m. is likewise supported by the evidence—in this case father's own testimony. In his testimony in the termination hearing, father admitted to his jealous motives in looking for mother, but also said that he drove around looking for mother "for many reasons." As noted above, he indicated that he was looking for mother at that hour, with his children in his car, in part because he wanted to retrieve medicine for a child and the children's car seats.

¶ 46. Finally, father's challenge to the trial court's finding concerning the "dress-burning" incident is well-founded, but the error is harmless. The trial court made the following finding: "On one occasion father was so angry at mother for wearing a dress that he believed was to impress another man that he drove her to a remote location—with the children in the car—and ripped the dress off, then burned it while the children watched. He also threatened that he would let his step-father rape mother. He admits taking the dress off and burning it, but denies the

18

threat." Father asserts that there was no evidence that father tore a dress from mother's body. We agree that this detail was not recited in the testimony presented. However, the rest of the court's recitation of the incident is supported by mother's testimony. This detail was not central to the court's decision and was harmless. See In re R.W., 2011 VT 124, ¶ 17, 191 Vt. 108, 39 A.3d 682 (explaining that in termination cases "error warrants reversal only if a substantial right of the party is affected" (quotation omitted)).

## IV. Reasonable-Efforts Determination

¶ 47.    Father also appeals the trial court's separate order reflecting its "reasonable efforts" determination, arguing that the court erred in finding that DCF had made reasonable efforts to comply with the case plan. We conclude that father's challenge is moot.

¶ 48.    A reasonable-efforts finding is essential to preserving federal funding for state child-welfare programs. 42 U.S.C. § 671(a)(15). Accordingly, Vermont law provides that upon the filing of a petition for a finding of reasonable efforts and a report or affidavit by DCF and notice to all parties, the Court shall hold a hearing within thirty days of the filing of the petition to determine whether DCF has made reasonable efforts to finalize the permanency plan for the child that is in effect at the time of the hearing. 33 V.S.A. § 5321(h). The statute provides that "[r]easonable efforts to finalize a permanency plan may consist of: (1) reasonable efforts to reunify the child and family following the child's removal from the home, where the permanency plan for the child is reunification; or (2) reasonable efforts to arrange and finalize an alternate permanent living arrangement for the child, in cases where the permanency plan for the child does not include reunification." Id.

¶ 49.    We have previously explained that "whether DCF made reasonable efforts to achieve permanency is a separate question from whether termination is in the child's best interests and the former is not a prerequisite to the latter." In re C.P., 2012 VT 100, ¶ 38, 193 Vt. 29, 71 A.3d 1142. The reasonableness of DCF's efforts to promote reunification may be relevant

to whether a parent's progress has stagnated and whether a parent is likely to be able to resume parenting within a reasonable time, so the same evidence may be relevant to both the reasonable-efforts determination and the termination decision. Id. Nonetheless, the two decisions present distinct issues.

¶ 50.    In this case, father contends that the reasonable-efforts determination was in error because the evidence shows that father's lack of progress was due to DCF's failure to allow increased visitation. Father has appropriately raised this issue in his challenge to the termination decision, and we have addressed it above in that context, determining that the trial court properly granted the petition to terminate father's parental rights. To the extent that father also seeks to challenge the separate reasonable-efforts determination based on the same argument, we conclude that the matter is moot. Having determined that the trial court properly granted the petition to terminate father's parental rights, there is no further relief this Court could grant to father by reviewing the standalone reasonable-efforts determination. See In re Moriarty, 156 Vt. 160, 163, 588 A.2d 1063, 1064 (1991) ("A case is moot if the reviewing court can no longer grant effective relief." (quotation omitted)); see also In re D.C.D., 105 A.3d 662, 675 (Pa. 2014) (explaining that remedy for not complying with reasonable-efforts requirement "is not to punish an innocent child, by delaying her permanency through denying termination").

Affirmed.

FOR THE COURT:

_____
Associate Justice

¶ 51.    **SKOGLUND, J., dissenting.**   "[T]he freedom of children and parents to relate to one another in the context of the family, free of governmental interference, is a basic liberty long established in our constitutional law." In re N.H., 135 Vt. 230, 236, 373 A.2d 851, 856 (1977). In order to ensure that this fundamental liberty will not be unduly denied, the Legislature has

20

expressly provided that a child be separated from its parents "only when necessary to protect the child from serious harm or in the interests of public safety." 33 V.S.A. § 5101(a)(3). In In re N.H., we wrote "[t]he statute certainly does not allow for intervention simply because a child might be better off somewhere else." 135 Vt. at 236, 373 A.2d at 856.

¶ 52. The deference to be accorded the parent-child relationship was eloquently described by the late Justice Larrow in his concurring opinion in In re J., 134 Vt. 480, 486, 365 A.2d 521, 525 (1976):

> I do not view the statute as trying to create the best possible world. I do not think it intends to set up a mechanism for transferring parental rights from those in temporary difficulty to those more affluent and adjudged by the social worker as more capable of educating and rearing the progeny . . . .

¶ 53. In the case of In re N.H., the Court noted "the existence of some questions concerning the ability of the appellant [father] to assume an active, responsible parental role." 135 Vt. at 237, 373 A.2d at 856. But the Court found it "beyond dispute that he, with the support of his parents, [stood] willing and able to provide N.H. with a family environment," and reversed the lower court's disposition order that had placed the child in the custody of the Department of Social and Rehabilitation Services, as it was called at the time. Id. at 237, 373 A.2d at 856-57. I suggest the same situation is present in this case.

¶ 54. In this case, mother and father had been in a "toxic" marriage for ten years and had four children. There was apparently parental fighting, neglect, and dysfunction. While mother testified that father was emotionally abusive, sexually coercive, and had threatened her physically on one occasion, she denied that father was ever physically assaultive. The conditions in the home were described as "filthy" and the children went to school dirty and odorous. Eventually, a child-in-need-of-care-or-supervision (CHINS) petition was filed, and the children were removed from the home in June 2016. After the children were removed from the home, mother and father ended their marriage.

21

¶ 55. At the first hearing following the removal, both parents took responsibility for the CHINS allegations and admitted that, at that time, neither parent was meeting the children's basic needs for hygiene, dental appointments, medical care, and therapy. They conceded that mother's unmet mental-health issues left her unable to protect the children from risk of harm and neglect and that father's preoccupation with mother prevented him from meeting the children's needs.

¶ 56. A September 2016 disposition plan called on father to fulfill many requirements, including: participation in and completion of a domestic-violence program; demonstration of an understanding of the impact his use of violence had on his family; commitment to living violence-free; signing of all releases for DCF regarding ongoing treatment recommendations; adherence to visitation guidelines as set up by the Department for Children and Families (DCF) and WomenSafe; attendance and participation in all court hearings; and maintenance of safe and adequate housing. For reasons not readily apparent, DCF's disposition case plan contemplated reunification with mother only or adoption. Father disagreed with the plan but agreed to participate in the Domestic Violence to Responsible Choices (DVRC) program. However, he was deemed ineligible because he denied physical-abuse allegations in the referral that DCF required him to sign. Father requested an evidentiary hearing on the issue of whether he had been physically abusive to mother, which the court consolidated with the hearing on the disposition plan. At the time of the consolidated hearing, mother was living in New Hampshire with her boyfriend.

¶ 57. At the consolidated hearing, the sole allegation of physical abuse was H.F.'s disclosure to a social worker that she allegedly watched father take mother into a room and then heard mother yell, "[s]top, no you are hurting me!" At the hearing, the court addressed father's counsel suggesting that the testimony seemed to be focused on physical violence. The court stated:

22

> [T]he Court has heard substantially more evidence of a pattern of controlling behavior, which is textbook domestic violence—battering behavior.
>
> You know as well as the Court . . . that domestic violence is not limited to physical violence and in fact, sometimes is even more violent and more destructive of relationships and particularly more concerning for children when it's psychological violence. And that's the evidence that the court has heard thus far here.

¶ 58.	After the first day of the consolidated hearing, the court informed the parties that the court would not require proof of physical violence to support a finding of domestic violence. During the second day, the court again reiterated the distinction it applied to domestic violence: "the question for the [c]ourt is whether . . . it's a problem that's symptomatic of a larger problem, which is a pattern of domestic abuse, which extends beyond or does not necessarily include physical violence, but may include emotional violence and controlling behaviors."

¶ 59.	In its written decision, the court found by a preponderance of the credible evidence that father did engage in a pattern of domestic abuse. It noted that father denied physical violence and wrote "while there may not have been a well-established pattern of physical violence, there was a clear pattern of emotional abuse and controlling behavior, directed primarily at [m]other, but also at the children." The court then held that there were no facts that warranted the exclusion of reunification with [f]ather as a goal of the plan, stating, "[i]ndeed, if there were no hope or expectation of reunification with father, there would be no need for his completion of a batterer's intervention program." It adopted the plan with one exception: that the case plan goal be modified to recommend reunification with mother or father or adoption.

¶ 60.	By the time father started DVRC, he had been in counseling for six months, was gainfully employed, had a stable home, and was consistently visiting with the children. He met the program's expectations and graduated from the twenty-six-week program on schedule. In fact, father's progress so impressed his instructor that she asked him to be interviewed about his experience for a television segment about the program. DCF, however, was not impressed and

23

remained fixated on the idea that father needed to admit to some unspecified instance of physical violence. Apparently, DCF did not understand the court's determination that the domestic abuse in this case was primarily emotional abuse and controlling behavior.

¶ 61. As described in the majority decision, the children were placed in two separate foster homes: the girls with a family in Bristol and the boys with another in Middlebury. The children all remained at the same elementary school and saw each other every day. At the post-disposition review hearing in February 2017, father asked DCF and the court to increase his visits. He proposed several family members who could support visits, including an aunt who was a licensed foster parent and early childhood educator. The court urged DCF to increase visits, but DCF did not. Father filed a formal motion to increase visits in April 2017.

¶ 62. After the motion was filed, DCF changed the visits from one hour a week with the girls and one hour with the boys, to a combined visit of one time per week for two-and-a-half hours with all four children. When father's motion came before the court for hearing on May 30, 2017, the permanency hearing occurred at the same time. That plan called for reunification to happen in the next three months or a termination-of-parental-rights (TPR) petition would be filed. Father agreed with the permanency plan that included reunification with him within three months but emphasized that increased visits were essential for him to realistically meet the three-month permanency goal and argued that he had insufficient contact with the children to effectuate the plan. At that hearing, the attorney for the children strongly advocated for father to have more contact with the children, reporting "on behalf of the kids who I've met with each of them individually, they would like to have more time with their dad." The social worker objected, claiming the clinical team did not support extended family supervising visits at all. The court did not increase visits at that time. Nor were visits gradually increased over the next three months. DCF indicated at a status conference it was not ready to support additional visits between father and the children supervised by father's aunt because of a failed letter-writing

scheme that was to occur between the aunt and the children.   It is worth noting, as did the court, that father's aunt had served as a licensed foster parent, had been an early-childhood educator for twenty-eight years, has a certification in Child Development, had operated her own day care, and had taken care of children with special needs.

¶ 63.   After some occurrence that resulted in the boys' foster mother seeking party status and a relief-from-abuse order against father which was withdrawn,[7] father filed a revised motion to transfer custody of all four children to his aunt and asked for a speedy hearing.  The following day, the state filed its petition to terminate father's parental rights.  Thus, less than two months after the permanency planning hearing where the State had assured the court it was not looking for an immediate TPR if reunification did not occur over the next three months,[8] it changed its mind.

¶ 64.   While the TPR was pending, father completed all aspects of the case plan—finishing DVRC, completing a parent-education program, and continuing to engage in counseling.   At the TPR hearing with a new judge presiding, the State argued that despite father's compliance with all aspects of the case plan, he had stagnated.   In the alternative the State argued that father had stagnated because he had not taken responsibility for physical abuse against mother.

¶ 65.   When mother took the stand to voluntarily relinquish her parental rights to the children, she testified that father had not been physically abusive towards her.  Question: "[D]id [father] ever physically hit or abuse you?"  Answer: "No."  She described the abuse in her marriage as "controlling and manipulative."  She specifically testified "[father's] never hit me. He's never been physical with me."

---

[7] The court found that father did not intend to scare or threaten anyone.

[8] "We don't want to create a situation where we're saying you have to be completely done by this date and oh, by the way, we're not going to let you, because we're pumping the brakes on everything that would get you there.  I mean, that would be . . . artificially be creating a situation where TPR would happen."

25

¶ 66. The court terminated father's parental rights, basing its decision on DCF's theory of stagnation because he had not taken full responsibility for his role in the neglect and abuse to which the children were exposed and that he failed to admit to physical violence. The court relied on factual allegations that were contained in DCF's characterization of the facts, not witness testimony. It erroneously found that all four children reported physical abuse by father when that was not true. It erroneously found that after father believed mother was having an extramarital affair, he "ripped [mother's] dress off, then burned it while the children watched." There was no testimony that he "ripped" the dress off mother, only that he subsequently burned it. The court also found that the prior judge, Judge Hoar, had specifically found that father physically abused mother. As discussed above, he did not. The court also said that the guardians ad litem (GALs) supported termination of parental rights. However, the GALs actually suggested a four-to-six-month window for father to have more visitation with the children to better enable reunification.

¶ 67. While acknowledging that "father has worked harder than many parents to comply with the case plan and has made laudable progress . . . even he agrees that he is not ready to take the kids home now." At the time of the hearing, father testified that he believed the children should not be returned to his home immediately because he had not been a part of their lives in two years despite his efforts, and he had not been given an opportunity to repair the damage in their relationship. The court acknowledged that father now lives in an appropriate home with a woman who has a college degree and a license as an elementary school teacher and who had previously worked at a childcare center. The court noted that she has not met the children because DCF would not allow it. DCF had also not allowed the children to see father's current home.

¶ 68. In TPR cases, the family court "first determine[es] whether there has been a substantial change in material circumstances from the initial disposition order, and, if there has,

26

whether the best interests of the child require termination of parental rights." In re D.S., 2016 VT 130, ¶ 7, 204 Vt. 44, 162 A.3d 1254. "A substantial change in material circumstances is most often found when a parent's ability to care for a child has either stagnated or deteriorated over the passage of time." In re S.W., 2003 VT 90, ¶ 4, 176 Vt. 517, 833 A.2d 879 (mem.) (quotation omitted). "Stagnation may be found if the parent has not made the progress expected in the plan of services for the family despite the passage of time." In re D.M., 2004 VT 41, ¶ 5, 176 Vt. 639, 852 A.2d 588 (mem.). However, this Court has repeatedly emphasized that "stagnation caused by factors beyond the parents' control [can] not support termination of parental rights." In re D.S., 2016 VT 130, ¶ 7 (quotation omitted). "We will affirm the [family] court's findings in support of changed circumstances unless they are clearly erroneous, and its conclusions if reasonably supported by the findings." Id. ¶ 6.

¶ 69. I suggest that the State failed to show by clear and convincing evidence that there had been a substantial change in circumstances to support the court's findings that stagnation had occurred or that father engaged in physical abuse. More disturbing, if there is stagnation on the part of father in this case, then we may as well stop pretending that the goal in juvenile judicial proceedings is preservation of the family. From the time reunification with father was added to the disposition plan, father did everything asked of him. DCF denied every suggestion made by father that he believed might promote healing for the children and the family. Did DCF consider that the children might be enthused about reunification with father if they had seen his new living situation, a clean, "appropriate" house? He was reprimanded for showing the children photographs of the new beds he bought for them. Would the children have benefited from meeting father's new partner, a major departure from their mother and her many issues? Why was he not allowed to have visitation with one child at a time, why must it have been a mass visitation with multiple children at one time where little intimacy could occur?

¶ 70.    Throughout this matter, the State and DCF continued to tumble together phrases of domestic violence and domestic abuse, failing to recognize the distinction articulated by Judge Hoar in the disposition hearings and decision, and insisting father admit to something he denied. Whatever evidence the court below thought existed concerning physical abuse cannot be considered clear and convincing, especially because mother testified to many obnoxious, controlling behaviors by father but adamantly denied he was ever physically abusive to her.  This decision should not stand.

_____

Associate Justice