VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org



Case No.     25-AP-033

*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant.  Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

JULY TERM,   2025

In re J.B., D.B., E.B., Juveniles      }      APPEALED FROM:
(D.B., Father\* & N.D., Mother\*)      }
                                       }      Superior Court, Grand Isle Unit,
                                       }      Family Division
                                       }      CASE NOS. 22-JV-00708, 22-JV-00710 &
                                                          22-JV-01648
                                              Trial Judge: Samuel Hoar, Jr. (merits);
                                              Howard A. Kalfus (termination)

In the above-entitled cause, the Clerk will enter:

Mother and father appeal termination of their parental rights to their children J.B., D.B., and E.B., born in March 2014, August 2015, and November 2022, respectively.  On appeal, mother and father argue that the evidence did not support the court's analysis of the children's best interests or the finding that the children were in need of care or supervision.  Father also contends that the court erred by combining the merits and temporary-care hearings and failing to correct an alleged conflict of interest by children's attorney.  We affirm.

### I.  Facts

The court found the following facts by clear and convincing evidence.[1]  In June 2021, petitions were filed alleging that J.B. and D.B. were in need of care or supervision (CHINS).  In December 2021, the court determined that the State had not proven the merits, and the children returned to parents' care.  In May 2022, the State again filed CHINS petitions as to J.B. and D.B.  Initially, parents retained custody under a conditional custody order (CCO).  In October 2022, the court issued an emergency care order placing J.B. and D.B. in the custody of the Department for Children and Families (DCF).  The State filed a CHINS petition as to E.B. in November 2022 a day after she was born, and she was placed in DCF custody.

Parents contested the CHINS petitions.  In May 2023, following a contested hearing, the court found that all three children were CHINS.  As to the older children, the court found the

---

[1]  The findings are from the court's orders terminating parents' rights and deciding the merits of the CHINS petition.  The CHINS findings were made by clear and convincing evidence.

children were chronically late or absent from school. Parents did not notify the school of the children's absences and failed to engage with the school to address the chronic absences. The absences had a meaningful, negative impact on each child's academic progress. Parents neglected the children's basic hygiene. They were not dressed for the weather and were frequently unclean, soiled, and not well rested. D.B. often had an odor of feces and J.B. of cat urine. J.B. wore clothing that was far too large, soiled, and stained. She had matted, oily hair, dirty skin, dirt under her nails, and a foul odor. D.B. was also unsuitably clothed, his hair was matted, his nails were black, his teeth had excessive plaque and his gums were red, and he had a strong odor. Parents would not admit the DCF worker into the home, but the worker observed a smell of cat waste and filth. The children were obese. J.B. gained twenty pounds between when she was returned to parents' custody in December 2021 and when the petition was filed in May 2022.

Although the children were initially placed in parents' custody under a CCO, parents violated several conditions designed to ensure the safety of the home and health of the children. Parents refused to allow DCF to conduct home visits. When DCF was allowed entry, the home was unclean and had a strong, unhealthy odor. Parents would not allow DCF to examine the space where the baby would sleep once born to make sure that it was safe and appropriate. The CCO required parents to provide releases for physicians and parents refused. They also refused to sign releases regarding their substance-abuse treatment.

Based on violations of the CCO, the court ordered the children into DCF custody in October 2022. E.B. was born in November 2022 and came into custody the day after her birth. The court found that E.B. was also at risk of harm given the experiences of her siblings and parents' violations of the CCO. All three children have remained in custody since their removal from parents' care.

J.B. was placed in a foster home with her fictive grandmother, who previously cared for J.B. for periods when she was two and seven. J.B.'s foster mother engaged in J.B.'s education and discussed J.B.'s therapeutic needs with J.B.'s counselor. J.B.'s foster mother and her partner developed loving relationships with J.B. J.B. was diagnosed with disinhibited social engagement disorder and benefitted from engagement with a counselor. J.B. began to enjoy school, was doing well academically, had friends, and was involved in extracurricular activities. At the time of the final hearing, J.B. was healthy, was growing strong, had proper hygiene, and was properly clothed. She displayed anger before and after visits with parents and indicated to her foster mother than she did not want to attend visits.

D.B. was diagnosed with post-traumatic stress disorder (PTSD) and attention-deficit/hyperactivity disorder (ADHD). He was initially placed in several foster homes, but he moved to a residential treatment program. He had difficulty controlling his emotions and became aggressive. D.B. intentionally defecated on furniture at a foster home. D.B. struggled with losing weight and displayed regression in social interactions. He required structure, individual support, and trauma-informed caregiving.

E.B. was placed with mother's cousin and her partner. E.B. was doing well physically and loved her daycare. E.B. developed a loving relationship with all members of her foster family, including her foster siblings and a friend who resided with the family. E.B.'s foster parents committed to providing permanency for E.B. E.B.'s and J.B.'s foster parents facilitated contact between the siblings.

2

The initial case plan had a goal of adoption. In June 2023, the State filed petitions to terminate parental rights at initial disposition. In December 2023, the petitions were withdrawn. In April 2024, the State again filed to terminate parents' rights to all three children. The court held a hearing over several days.

Based on the evidence the court found the following. Parents were not able to consistently maintain their home in a safe, sanitary condition. During announced visits to the home, DCF workers observed trash littering the porch and white powder, believed to be illicit drugs, in the home. The home smelled strongly of bleach and cigarettes. During unannounced visits, the home smelled of cat urine. Parents had supervised visits with the children—twice weekly for J.B. and E.B., and once for D.B. Family Time Coaching was implemented to assist parents in progressing to unsupervised visits. This coaching involved meeting with parents before and after visits to discuss the skills parents needed to work on and how to improve. Parents often arrived late to visits or left early, causing them to miss this critical opportunity. The coaching ended after thirteen months due to parents' lack of progress. Even though it was prohibited, parents also used cell phones during visits, which resulted in them missing chances to interact directly with the children.

Parents displayed a lack of insight regarding the issues that brought the children into custody initially. Despite concerns about the children's history of obesity and D.B.'s ongoing weight issues, parents continued to bring candy, muffins, and other sugary foods and drinks to visits. Parents did not gain sufficient knowledge regarding nutrition even though this was a concern leading to the children's removal. Parents continued to discuss returning home with J.B., even though she made it clear that she did not want to be reunited, she had been in and out of foster care several times, and the discussions were harmful to her mental health. Father displayed a lack of impulse control that interfered with his progress. He was escalated and dysregulated during visits, interfering with the children's ability to regulate their own behavior. He also escalated during meetings, impeding his ability to work with professionals in the children's lives. He did not engage in mental-health counseling. The family court observed that during the termination hearing father repeatedly spoke out of turn, interrupted others, and banged on the table. Mother was diagnosed with PTSD and ADHD as well as anxiety and depression. She had a counselor, but did not engage and stopped attending in the last months of 2024. Mother did not take responsibility for the circumstances leading to the children's removal or lack of progress and blamed others. She did not acknowledge the health risks of the older children's obesity or lack of personal hygiene.

Based on the evidence, the court analyzed the children's best interests. As to the first factor, the relationships of the children, the court found that it did not weigh strongly in favor of termination for all children. It found this factor weighed more strongly in favor of termination for J.B. and less so for D.B., who did not have a foster parent. Parents loved the children, but the relationship was impeded by their provision of unhealthy foods, father's dysregulation, and parents' distraction with their cell phones. J.B. and E.B. had loving relationships with their foster parents and extended foster families.

As to the second factor, the children's adjustment to their home, school, and community, the court found that it weighed strongly in favor of termination as to E.B. and J.B. J.B. was adjusted to her home, school, and community. She was doing much better in school and was thriving. If she returned home, she might have to attend her former school where she was bullied and did not perform well academically. E.B. adjusted to her kinship foster home. A return home

would require a new daycare. Because D.B. was living in a community home and not in a permanent placement, this factor had less application to him.

Most importantly, the court found that parents would not be able to resume parenting within a reasonable time as measured from the children's perspective and this factor weighed strongly in favor of termination. The case was pending for two years and parents had not demonstrated progress toward addressing the issues leading to the children going into custody, including truancy, health concerns over obesity, poor hygiene, and the unsanitary condition of the home. Parents lacked insight into how these issues impacted the children. They continued to bring sugary, unhealthy snacks to visits and did not control portions given to the children. They did not demonstrate an ability to maintain a clean home. They did not address their mental health. Father continued to become elevated and dysregulated, which interfered with his ability to work with service providers, counselors, and school personnel. Mother was passive in response to father's disruptive behavior.

The final factor—the parents' role in the children's lives—also weighed in favor of termination. Although parents loved the children, their behavior was not constructive and impeded progress. Therefore, the court concluded that termination was in the children's best interests. Both parents appeal, raising arguments related to both the court's determination of the CHINS merits petition and its order terminating parental rights.

## II. CHINS Merits Decision

We first address the arguments regarding the CHINS decision. To demonstrate that a child is "in need of care or supervision," the State has the burden of proving by a preponderance of the evidence that the child "is without proper parental care or subsistence, education, medical, or other care necessary" for the child's well-being.[2] 33 V.S.A. §§ 5102(3)(B), 5315(a); In re L.M., 2014 VT 17, ¶ 19, 195 Vt. 637. In assessing a petition, the court may consider "the circumstances leading up to the filing of the CHINS petition" to gain "a full picture of the child's well-being." In re L.M., 2014 VT 17, ¶ 20.

Father argues that the family court erred by combining the hearing on the merits of the CHINS petition with the temporary-care hearing. As father highlights, these are distinct issues with different evidentiary standards. At merits, the State must prove that the children are CHINS by a preponderance of the evidence and hearsay is not admissible. 33 V.S.A. § 5315(d). In contrast, at a temporary-care hearing, reliable hearsay is admissible. Id. § 5307(f). There is, however, no prohibition in the statute against combining the hearings on these issues. In fact, the procedural rules allow combining hearings where there are common questions of law or fact. V.R.C.P. 42(a) (applicable in juvenile proceeding through V.R.F.P. 2(a)). The court's order demonstrates that it was mindful of the different evidentiary frameworks and separated its analysis and discussion of the issues involved for this reason. Given that the court acknowledged and followed the two standards, we conclude there was no error.

As to the merits, both parents allege that some findings were not supported by the evidence. In assessing the court's findings, we apply a deferential standard of review and will uphold findings unless they are clearly erroneous. In re D.B., 2003 VT 81, ¶ 4, 175 Vt. 618 (mem.). "We leave it to the sound discretion of the family court to determine the credibility of the witnesses and to weigh the evidence." In re A.F., 160 Vt. 175, 178 (1993).

---

[2] There are other bases for a CHINS finding that are not relevant to this appeal.

Father contends that the evidence did not support the court's finding by clear and convincing evidence that J.B. and D.B. were "morbidly obese," alleging that this is a medical term and there was no expert testimony to support this. Any error in using the term "morbidly obese" to describe J.B. and D.B.'s health did not amount to reversible error as the CHINS determination did not rest on this diagnosis. See In re L.M., 2014 VT 17, ¶ 18 (explaining that where court erred in relying on certain evidence reversal is appropriate in juvenile case only if other findings do not support court's conclusion). The import of the family court's finding was that the children were overweight when in parents' care, and parents were not properly responding. This finding is supported by the testimony of the health assistant at J.B. and D.B.'s school, who testified that J.B. and D.B. were overweight when in parents' custody and that they lost weight during the time they were in DCF custody and out of parents' care. To the extent parents contend that other evidence contravened these findings, we will not reweigh the evidence on appeal.

Both parents also contend that the court's findings regarding the children's school absences were not supported. Father argues that the evidence does not support the court's finding that the children were absent "more than twenty-five days." He alleges that some of these absences may have been late attendance and that the court failed to credit parents' explanation that the absences were due to illness. Mother argues that the evidence did not support the court's finding that J.B. and D.B. "were habitually and without justification truant from compulsory school activities." The court's findings were supported by the evidence. The children's attendance records were admitted into evidence and the principal testified concerning the absences. The principal stated that J.B. was tardy fourteen times and absent twenty-eight times during the period between December to May when she was in parents' custody. Of those absences, parents did not notify the school on ten occasions. D.B. had a similar record of attendance. The health assistant at the school also testified that on four-to-seven occasions she requested that parents bring the children to a pediatrician given the number of absences, but parents did not follow through. Although mother contends that the court erred by failing to credit parents' excuses for the absences, it was up to the court to weigh the credibility of these explanations. We will not reevaluate the weight to give this evidence on appeal. In re A.F., 160 Vt. at 178 ("We leave it to the sound discretion of the family court to determine the credibility of the witnesses and to weigh the evidence."). The evidence supported the court's finding that the children were chronically absent and that parents failed to engage with the school to address this issue.

Finally, father argues that the State failed to prove that the children were at risk of harm, alleging that the family was separated simply due to poverty. Father claims that the CHINS determination was based merely on findings that the condition of the home was unpleasant and the children had poor hygiene and the State failed to link these observations to any risk or adverse health impact. As to E.B., father asserts that she was found CHINS simply because mother did not release information about her prenatal care to DCF.[3] Father's argument depends on an interpretation of the evidence and the record that is at odds with the family court's findings. Father is essentially asking that we accept his version of the evidence, a request beyond our standard of review. The family court's CHINS adjudication for the older children

_____

[3] Father contends that mother's decision not to release her medical records to DCF was not relevant and should not have been considered in the court's merits decision. Because the merits decision was based on other concerns, we do not address the relevance of mother's medical records.

was based on its findings that parents were chronically inattentive to J.B. and D.B.'s hygiene, that the home was in an unhealthy condition, and that parents neglected the children's education, causing harm. The history of these conditions of the older children coupled with parents' refusal to work with DCF and violation of the CCO were sufficient for the court to find that there was a risk of harm to newborn E.B. These findings were all supported by the evidence, and the merits decision is therefore affirmed.

## III. Reasonable Efforts

Father next argues that the State failed to make reasonable efforts to reunify the family before seeking to terminate parental rights. The reasonable-efforts question is "a separate question from" whether termination is in the children's best interests.[4] In re D.F., 2018 VT 132, ¶ 49, 209 Vt. 272 (quotation omitted). We have held that "the court is not required to find DCF made reasonable efforts as a prerequisite to termination." In re C.P., 2012 VT 100, ¶ 38, 193 Vt. 29. When termination is sought at initial disposition, as here, the sole question is whether it is in the child's best interests. Id. Therefore, we do not address the arguments regarding reasonable efforts and focus instead on the court's analysis of the children's best interests.

## IV. Termination Decision

The family court may terminate parental rights at the initial disposition proceeding if it finds by clear and convincing evidence that termination is in the child's best interests. In re J.T., 166 Vt. 173, 177, 180 (1997). In assessing the child's best interests, the court must consider the statutory factors. 33 V.S.A. § 5114(a). These factors are the child's interaction with parents, siblings, foster parents, and other significant persons, the child's adjustment to the existing home, school, and community, the likelihood the parent will be able to resume parental duties within a reasonable time, and the parent's history of playing a constructive role in the child's welfare. Id. § 5114(a)(1)-(4). The third factor regarding the parent's ability to resume parenting duties within a reasonable period is the most important. In re J.B., 167 Vt. 637, 639 (1998) (mem.). On appeal, we uphold the family court's conclusions if supported by the findings and affirm the findings unless clearly erroneous. Id.

On appeal, mother argues that the family court erred in assessing the best-interests factors and terminating her rights at initial disposition. Father similarly argues that the State failed to prove that termination was in the children's best interests. "When findings are attacked on appeal, our role is limited to determining whether they are supported by credible evidence." In re A.F., 160 Vt. at 178.

Mother claims that the evidence did not support the court's findings that the children's adjustment to home and school weighed strongly in favor of termination. The court found that J.B. and E.B. were thriving in their foster homes and had adjusted to school and daycare. J.B. was doing much better in her new school. Mother's own testimony supported these findings, and she does not challenge them on appeal; rather, she claims that the court improperly focused on

---

[4] Father makes several generalized arguments concerning Vermont's statutory procedures for terminating parental rights, claiming that many states require a reasonable-efforts determination prior to termination and that Vermont children experience termination of parental rights at a higher rate than the national average. Our task is to apply the statutory scheme adopted by the Legislature. To the extent father believes that these procedures require modification, those arguments are more appropriately addressed to the legislative process.

how a return to parents' care might require J.B. to return to a school where she had not done well and E.B. to change daycares. According to mother, it was speculation whether J.B. would need to change schools or whether a change in daycare would be disruptive to E.B. The trial court's findings were supported as to this factor. In accordance with § 5114(a)(2), the court examined J.B. and E.B.'s adjustment to their current home, school and community and determined that they were thriving and well adjusted. The fact that the court was also concerned about how a disruption might affect the children did not undermine its findings on this factor. The court made its decision based on the facts and not on speculation.

Mother also asserts that the evidence did not support the court's findings that parents would be unable to resume parenting in a reasonable time, and that parents' role in the children's lives was not constructive. Mother claims that there was no opportunity for parents to demonstrate progress towards the truancy issues, the sanitary condition of the home, or the children's hygiene because the children were no longer living with them and DCF did not conduct a visit to the home. As explained above, the CHINS petition was granted primarily due to children's chronic absences and parents' unwillingness to work with the school to address that issue, the children's poor hygiene, and the unsanitary condition of the home. The court recognized that parents could not demonstrate progress towards addressing the children's absences. Parents were on notice regarding the other concerns, however, and the court found that they did not work to demonstrate progress.[5] They lacked insight into how the issues impacted the children and continued to bring sugary foods to visits. They did not engage with Family Time counseling. They did not demonstrate an ability to maintain a clean, healthy home. They did not address their mental health, and father became elevated and dysregulated, inhibiting him from working with the children, counselors, and school personnel.

Mother claims it was error for the court to focus on parents bringing unhealthy foods and on D.B.'s obesity in assessing their future ability to parent. Similarly, as to parents' role in the children's lives, mother contends that the court erred in faulting parents for engaging in "future talk" with J.B. Father also raises several arguments regarding the court's weighing of the statutory factors. The court's decision reflects that it properly considered each factor and that its assessment was not erroneous. The court focused on parents' understanding of the children's nutritional needs because this was one of the reasons for the CHINS determination. As to D.B., the court found that parents bringing unhealthy foods demonstrated their lack of understanding around his proper nutritional needs. Despite mother's contention, the court did not fault parents for D.B.'s ongoing weight issues; rather, it recognized that they were not acting to improve his condition. Overall, mother's arguments go to the family court's weighing of the evidence and assessment of the factors, which are matters within that court's discretion. See In re D.M., 2004 VT 41, ¶ 5, 176 Vt. 639 (mem.) (explaining that court has "broad discretion" in evaluating petition to terminate parental rights).

---

[5] Father contends that there was no court-approved disposition plan and therefore parents did not have notice regarding which goals they needed to accomplish. A court-approved plan of services is not a precondition to termination at initial disposition. See In re J.T., 166 Vt. at 179 (rejecting parent's argument that termination of parental rights at initial disposition without approved case plan was reversible error). In any event, the record indicates that parents had adequate notice of the issues that led to removal of the children from parents' care and the expectations for parents' improvement. DCF filed case plans in July 2022 for J.B. and D.B. and December 2022 for E.B., there were several conditions in the initial CCO, and the merits decision highlighted the issues parents needed to address.

Finally, both parents argue that the court's weighing of the factors as to D.B. was particularly erroneous given his negative experience in DCF custody and his lack of a permanent placement. We conclude that the family court did not err in assessing the factors as to D.B. The court acknowledged that D.B. had a different experience than the other children, but ultimately concluded that parents' inability to resume parenting within a reasonable time weighed in favor of termination. Given that D.B. was still young, had been in custody for almost three years, and had several diagnoses which required a structured, supportive environment, the court acted within its discretion in determining that parents would not be able to resume parenting in a reasonable time and therefore termination was in D.B.'s best interests.

IV.  Children's Attorney

Finally, father asserts that the children's attorney had an obvious conflict of interest requiring reversal. Father claims that D.B. wanted to return to parents' care and J.B. did not and this created a conflict for the children's attorney. This Court has recognized that "one attorney may represent more than one child in a juvenile proceeding and will not be disqualified unless an actual conflict arises." In re L.H., 2018 VT 4, ¶ 35 n.9, 206 Vt. 596 (emphasis added). " 'An actual conflict exists when an attorney's professional judgment for one client necessarily will be affected adversely because of the interests of another client.' " In re Jasmine S., 63 Cal. Rptr. 3d 593, 601 n. 6 (Ct. App. 2007) (quoting 2 R. Mallen & J. Smith, Legal Malpractice § 16:2, at 818 (2007 ed.)). "If competent evidence does not establish such a conflict, the attorney is not disqualified for a conflict." Id. at 600.

Father has failed to demonstrate how this argument was raised below and therefore preserved for appeal. See In re C.H., 170 Vt. 603, 604 (2000) (mem.) (explaining that parent must raise issue in family court to preserve it for appeal). Because father did not allege in the family court that there was an actual conflict or move to have different counsel for D.B., the family court did not have the opportunity to respond and evaluate whether an actual conflict existed. To the extent father claims that this error was "structural" and did not require preservation, he has failed to demonstrate such an egregious error. The fact that the children expressed different wishes did not in itself create an actual conflict of interest. Father has not identified any compelling evidence to show that an actual conflict existed here.

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
Karen R. Carroll, Associate Justice

_____
Nancy J. Waples, Associate Justice

8